TURNER HOLDINGS, INC., Plaintiff,

v.

HOWARD MILLER CLOCK COMPANY, Defendant.

No. G84–222 CA1.

United States District Court, W.D. Michigan, S.D.

Feb. 24, 1987.

Lisa Klein, Fried, Frank, Harris Shriver & Jacobson, New York City, Miller, Canfiled, Paddock and Stone by Lawrence D. Owen, Richard A. Gaffin, Grand Rapids, Mich., for plaintiff.

Charles B. Manuel Jr., Davis, Markel, Dwyer, & Edwards, New York City, Steven C. Kohl, Landman, Luyendyk, Latimer, Clink & Robb, Muskegon, Mich., for defendant. ·

## OPINION

HILLMAN, Chief Judge.

Plaintiff, Turner Holdings, Inc. ("THI"), a New York investment banking company, entered into a "letter" agreement with defendant Howard Miller Clock Company ("HMCC"), a Michigan furniture manufacturing company, whereby THI agreed that it would "endeavor to locate appropriate candidates for acquisition and to advise you as to the best way to proceed towards one or more completed transactions." This letter agreement dated August 31, 1981, is annexed at the conclusion of this opinion.

Plaintiff now seeks to recover $177,000, which it alleges is due as a success fee under the contract as a result of defendant's acquisition of Hekman Furniture Company, a company which plaintiff claims was "under consideration" during the term of the contract. Plaintiff also seeks $968.44 to cover reimbursable expenses which it incurred during the term of the contract.

This case was originally filed in the United States District Court for the Southern District of New York and transferred here pursuant to the grant of a motion for a change of venue. Subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(1). The case was tried to the court and the following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Two issues are in dispute. The first is whether the suit is barred by the operation of the Michigan Real Estate Brokers Act, M.C.L. § 339.2501, *et seq.,* (hereinafter "The Act"). The second involves the interpretation of a portion of the contract which provides that HMCC "will continue to be obligated to THI for 'success fees' for a period of two years beyond the termination date [of the contract] for any company which has been under consideration." The controversy centers around the meaning of the term "under consideration," and whether Hekman Furniture Company, a company which HMCC purchased within two years of the termination of the contract, was "under consideration" during the term of the contract. Under the rule of *Erie Railway Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Michigan law will be applied to decide the issues presented.

HMCC, a highly successful manufacturer of top grade clocks located in Zeeland, Michigan, began to examine possible acquisition of a furniture company approximately a year prior to contacting Turner in 1981. The reasons were two-fold: the desire to diversify into a business compatible with HMCC's principal business of wood clock manufacturing and a perceived need, because of tax code requirements, to make use of a substantial amount of cash being held by HMCC as retained earnings. Jack Miller, president of HMCC, had a working knowledge of the home furnishings industry gained from his 30 years of business experience, regular attendance at industry trade shows, and regular examination of the trade literature. Miller also knew many of the manufacturers, the nature and price level of their products, and their sales volume, as reported in the trade literature.

However, working on his own, Miller had not made satisfactory progress towards acquiring a furniture company. He concluded he needed assistance to "make something happen." He turned to THI for professional assistance. Miller was introduced to Webb Turner through Miller's accounting firm in Grand Rapids. One of the firm's other furniture company clients had recommended Turner. The first meeting between Miller and Turner took place at High Point, North Carolina during a trade show for furniture manufacturers.

Turner graduated from Duke University with a B.A. in Economics. In May of 1965, he began work as a management consultant in New York. As a management consultant he gave professional advice to manufacturers on cost reduction, acquisition of assets and other management problems. In the late '70s Turner served as a senior merger/acquisition officer with the investment banking houses of Paine-Webber and Bear, Stearns.

Turner also had had an extensive background in acquiring furniture companies for his own account. Under the corporate structure of Turner Holdings, Inc., Turner acquired a major stock and/or asset interest in five or six furniture companies. In 1981, Turner founded Turner Furniture for the purpose of serving as a holding company for his acquisitions. Turner's eventual acquisitions included manufacturers of case goods and occasional furniture and a manufacturer of water beds. Turner's activities created a potential conflict of interest between himself and HMCC which both parties recognized. Both Turner and HMCC were interested in acquiring middle to upper "price-point" occasional furniture manufacturers. The parties, however, spe-

cifically agreed that although Turner would continue to acquire companies for Turner Holding, he would not actively work for other buyers, who like HMCC, were interested in making acquisitions in the occasional furniture market.

Webb Turner, Jack Miller, and Philip Miller, Jack Miller's brother and vice-president of marketing for HMCC, first met in High Point, North Carolina on April 12, 1981. They met again on August 27, 1981 in Zeeland, Michigan. During these meetings and in several intervening telephone conversations, the Millers and Turner discussed the types of acquisitions which HMCC was interested in making and Turner's qualifications for assisting them in attaining their goals.

On August 31, 1981, Turner sent Miller a draft letter which embodied the terms of engagement discussed during the prior meetings and telephone conversations. The contract was executed by HMCC on November 3, 1981. Apparently, the contract was never reviewed by counsel for HMCC. Nor did the parties have any specific discussion about when a company was to be deemed "under consideration."

The contract provided, in relevant part, that HMCC would retain THI in connection with HMCC's "acquisition program" as its "exclusive agent" to "locate appropriate candidates for acquisition and to advise [HMCC] as to the best way to proceed." In consideration for its services, HMCC agreed to pay THI its expenses and a "success fee" "upon the consummation of any acquisition or investment in the furniture manufacturing field." The fee was to be calculated using the "Lehman Formula": five percent of the first million dollars of the purchase price, plus four percent of the second million, three percent of the third million, two percent of the fourth million, and one percent of the remainder of the purchase price. This fee arrangement is customary in the investment banking industry. This fee was to be the sole compensation received by THI for its work under the contract and was not to be paid if HMCC did not acquire a company which had been "under consideration" during the

pendency of the contract. The contract expressly stated that "no distinction would be made, in determining THI's right to its fee, between companies introduced by HMCC and those introduced by THI."

The contract further provided that THI's duties would include "identify[ing] all public companies, divisions of public companies, as well as all private companies which ... meet [HMCC's] acquisition criteria" and "contacting these companies with a view towards obtaining the requisite financial and operating information for comparative analysis." It went on to discuss THI's role in the later phases of HMCC's broad based acquisition program. Over an engagement period of several years, HMCC hoped that THI would "develop appropriate strategy for the follow up on acquisitions."

The contract included a tentative time frame for the completion of HMCC's first acquisition. Within three months of execution the parties hoped to select four to ten prime targets and, "with reasonable fortune" and "assuming" the issue of price was successfully dealt with, a first closing was envisioned two to three months thereafter.

HMCC's retention of THI was subject to cancellation at any time upon thirty day written notice by either party. HMCC remained obligated to pay THI a fee for a period of two years beyond the termination day. Such post-termination clauses are standard for contracts of this type and are necessary to protect a party in the position of THI, where its sole compensation was contingent and the client had the right to terminate at will. HMCC's post-termination obligation applied only to the acquisition of those companies which had been "under consideration" during the term of the contract.

Following the execution of the contract, the parties arranged a meeting to "zero in on target companies."

Turner prepared for this meeting by gathering information about the furniture industry. He also spent time analyzing the information in order to select companies compatible with HMCC's existing business from a marketing and distribution stand-

point. Such information was to be used by THI and HMCC to determine appropriate acquisition targets, financing, prices and strategy. The meeting was held in Zeeland, Michigan on January 6, 1982. At the meeting, THI provided HMCC with a binder containing financial information about various companies in the furniture industry. Together, the parties reviewed the information in the binder and created a list of companies which fit HMCC's acquisition criteria. Turner talked with the Millers about which of these companies he thought might be available and which would be more difficult to "shake loose."

Prior to the conclusion of the meeting, the parties drew up a list of furniture companies which, based on their discussions, the Millers wanted Turner to pursue. Hekman was on that list, although Hekman did not appear on what was labeled: "short list." Hekman was a long time well respected manufacturer of occasional furniture located in Grand Rapids, Michigan, close to HMCC's headquarters in Zeeland, Michigan. Hekman had recently been purchased by Beatrice Foods, a large conglomerate located in Chicago. The parties agreed that Philip Miller would review the material in the binder at greater length to create a "shopping list."

On January 14, 1982, Jack Miller conveyed to Turner the results of the Millers' review of the binder. Notes taken at the meeting by both Jack Miller and Turner reflect that HMCC was interested in finding out more about Hekman.

On January 22, 1982, the Millers narrowed their "shopping list" further. As reflected in Jack Miller's notes, HMCC directed THI to proceed on its behalf on four fronts. First, Turner was to contact and obtain information on Pearl and Craftline, two competing clock companies. Next, Turner was to pursue Hitchcock, Hekman, Jasper and Cochran, four furniture companies which met HMCC's acquisition criteria. On the third front, Turner was to contact business brokers in the West and Southwest to inquire whether any brokers were listing companies that met HMCC's acquisition criteria. Last, three other furniture companies were to be examined, but, as was reflected in Jack Miller's notes, Turner was instructed to concentrate on fronts one through three.

During February, 1982, the parties had several telephone conversations during which Turner reported on his progress on fronts one through three. He told Jack Miller that he had contacted Pearl, Craftline and Beatrice, Hekman's parent company, by telephone and visited Hitchcock in Connecticut. On February 22, 1982, Turner presented to Jack Miller the material THI had gathered regarding Pearl and Craftline. As a result of an examination of those materials, the Millers placed a "hold" on the pursuit of those companies. Jack Miller testified that none of his other January 22 directions to Turner changed. Thus, the "hold" placed on category one narrowed the companies on HMCC's "shopping list" to Hitchcock, Hekman, Jasper, and Cochran.

On February 22, 1982, Jack Miller told Turner that he had received a "lead" from Continental Illinois Bank that Hekman was being "put up on the auction block" and he asked Turner to contact Hekman immediately. With respect to the other companies on the "shopping list," the parties, as of February 22, had not contacted Cochran; had received financial information on Hitchcock; and understood that Jasper was not available and probably would not be for at least the next year.

Turner immediately set about pursuing the Hekman lead. However, as reflected in his notes dated March 4, 1982, his contact at Beatrice was on vacation. Less than two weeks thereafter, Turner reached Beatrice but was told that they were not interested in selling Hekman. Turner reported this to Jack Miller. Less than a week later, HMCC received further information from Continental about Hekman and Jack Miller asked Turner to follow through by checking with Gerry Becker, an officer at Beatrice, concerning this lead. HMCC also reviewed with Turner some financial information on Hekman which HMCC received from Continental.

On March 12, 1982, Turner telephoned Becker and received mixed messages as to Beatrice's interest in selling Hekman. The official position was "no way, no how." However, Becker suggested that Turner write Becker directly so that his client's interest in purchasing Hekman would be reflected in Beatrice's files. He also told Turner that Beatrice was reviewing all of its companies, and told Turner that if Beatrice was "to get a buyer" for Hekman, its chief executive officer would "at least look at it." During a second phone call with Turner later that day, Becker reported that Ted Ruwich, Beatrice's senior vice-president and assistant to the chairman, when questioned about the sale of Hekman replied, "absolutely not." But Becker agreed to call the individual at Continental from whom HMCC had received its "tip," to identify Continental's source at Beatrice and investigate the conflicting responses. Turner reported to Jack Miller the substance of these telephone conversations with Becker. Jack Miller's notes of March 12, reflect his understanding that "like many other properties [Hekman] could possibly be purchased" and that "Becker would review considering [HMCC's] interest." Jack Miller's notes further indicate that he expected Turner to "keep in contact."

Turner also made contact with Richard Truelick, a former official of Beatrice who had been in charge of Beatrice's mergers, acquisitions and dispositions, and offered to split any fee which Turner might receive upon the consummation of a purchase of Hekman by HMCC if Truelick could "shake something loose." Truelick was unsuccessful although he met with the chairman of Beatrice, and learned that while Hekman was not now for sale it might be in a year.

As they anticipated no acquisitions in the immediate future, the contract between THI and HMCC was terminated, by mutual assent, on December 1, 1982. It is clear that Jack Miller was frustrated by the lack of progress in acquiring a company. The parties, of course, knew a commission would be due Turner on any HMCC acquisition during the next two years if it had been "under consideration" while the contract was in force. In the letter of termination from Jack Miller to Turner, in an apparent effort to avoid any misunderstanding, two companies were listed as being "under consideration": Jasper Cabinet Company and Kittinger Company. Jack Miller testified that he listed Jasper because it was for sale; HMCC had received four years of financial data on it; he had visited the plant and had worked out a purchase price for it. Kittinger was listed because it was for sale by General Mills; there had been talk of joining forces with Turner to buy it; and, there was an understanding that Turner would continue to "work on it." In the December 1 letter HMCC also requested a bill for THI's out-of-pocket expenses.

Turner did not respond immediately to Miller's letter. He did, however, continue to work on Kittinger and several other companies for HMCC. Among them was Hekman. HMCC also began to cultivate contacts at Hekman. In February of 1983, Beatrice announced that it intended to sell Hekman. In early July, Salomon Brothers, a New York investment banking firm hired by Beatrice to handle the sale, forwarded information on Beatrice to companies and persons who might be interested in bidding on Hekman. On July 14, Turner forwarded the information he received to HMCC. On the previous day, however, HMCC received the same information directly from Salomon Brothers, and on July 22, returned the information which had been forwarded by THI.

In a letter to Jack Miller dated May 5, 1983, Turner listed Hekman among 84 other companies which he believed were "under consideration" during the pendency of the THI–HMCC contract. He also included the list of his outstanding expenses requested in HMCC's December 1, 1982 letter. On July 27 Turner sent another letter stating his belief that THI would be entitled to a "success fee" if HMCC were to acquire Hekman. Jack Miller responded to Turner's July 27 letter on August 3. He sent a copy of a letter dated May 20, which THI claims it never received. The May 20 letter contained a revised listing of eight companies which Miller was willing to accept as being "under consideration." Hek-

man was not on the list. Both Turner and HMCC eventually bid on Hekman. HMCC was successful and, in the fall of 1983, purchased Hekman for $7.7 million. No "success fee" was ever paid to Turner.

At trial, Turner testified that he was "flabbergasted" by Jack Miller's suggestion on December 1 that only two companies were "under consideration" during the term of the contract. He also testified that he did not immediately express his anger because he and Miller were still working together on HMCC's acquisition program. Turner also testified that he bid on Hekman in order to "protect his investment."

■ At trial defendant renewed the argument which was the basis for its earlier summary judgment motion which had been denied after a hearing on July 9, 1984. Defendant argued that this action is barred by the operation of M.C.L. § 339.2512a. This section provides that only parties licensed as "real estate brokers" may bring an action to collect a commission on certain types of real estate transactions. A real estate broker is defined as:

"(a) ... an individual, partnership, association, or corporation, who with intent to collect or receive a fee, compensation, or valuable consideration, sells or offers for sale, buys or offers to buy, appraises or offers to appraise, lists or offers or attempts to list, or negotiates the purchase or sale or exchange or mortgage of real estate, or negotiates for the construction of a building on real estate; who leases or offers or rents or offers for rent real estate or the improvements on the real estate for others, as a whole or partial vocation; who sells or offers for sale, buys or offers to buy, leases or offers to lease, or negotiates the purchase or sale or exchange of a business, business opportunity, or the goodwill of an existing business for others; or who, as owner or otherwise, engages in the sale of real estate as a principal vocation."

M.C.L. § 339.2501. Neither Turner nor THI are licensed in Michigan under this statute.

Plaintiff claims that the services it provided HMCC were those normally provided by investment bankers, and therefore, did not fall within the terms of the Act. Defendant, on the other hand, argues that THI was attempting to negotiate the purchase of a business, that THI was prohibited from engaging in such activities without a broker's license and that THI is therefore barred from seeking compensation.

Defendant cites *Jaenicke v. Davidson,* 290 Mich. 298, 287 N.W. 472 (1939); *Krause v. Boraks,* 341 Mich. 149, 67 N.W.2d 202 (1954); and *Curry v. West Point Hills, Inc.,* 30 Mich.App. 114, 185 N.W.2d 907 (1971). These cases involved sales of oil leases, land contracts and mortgage interests, all typically broker business.

Defendant also cites *Lakeshore Financial Corp. v. Comstock,* 587 F.Supp. 426 (W.D.Mich.1984), *affirmed without opinion,* 779 F.2d 51 (6th Cir.1985), in support of its position. In *Lakeshore,* Judge Gibson, of this district, granted plaintiff's motion for summary judgment in a declaratory judgment action seeking a decree that the defendant was not entitled to a "finder's fee" for arranging and negotiating a merger between two banking corporations. The court emphasized that defendant, the party seeking the commission, had "negotiated the sale or exchange of a business." *Lakeshore,* 587 F.Supp. at 429. While this is activity which clearly falls within the words of the Act, it is not the activity which THI was engaged in.

At trial plaintiff offered the testimony of Fred Schinagel, Managing Director of the investment banking firm of Dean, Whitter, Reynolds, about the role of one who provides the services which THI provided for HMCC. He identified two major functions of an investment banker: raising funds for corporations and acting as a financial advisor. Schinagel explained that when a client is interested in a merger or an acquisition the role of the investment banker includes identifying appropriate targets, educating the client about the industry, and characterizing the attractiveness, in light of the client's needs, of various companies. At trial Schinagel was asked to compare the roles of an investment banker and a business broker. His response was that a

business broker generally represents a seller who wants to list a business with the broker, while an investment banker represents either sellers or buyers. He also observed that while business brokers usually have small family owned businesses like bars and grills as clients, the client base of investment bankers tends to be much broader. According to Schinagel, an investment banker is a "businessman's businessman." He provides financial and business advice. He normally is not a part of the negotiating team. Instead, he analyzes his clients' strengths and weaknesses and often advises on tax and financial implications of mergers and acquisitions. As described in the testimony of both Jack Miller and Turner, the services which THI performed for HMCC were the services traditionally performed by an investment banker, as opposed to those performed by real estate salesmen or brokers whom an owner might seek out to sell his house or business.

In *Cardillo v. Canusa Extrusion Engineering, Incorporated,* 145 Mich.App. 361, 377 N.W.2d 412 (1985), plaintiff alleged that in an oral agreement between the parties, defendant agreed to pay plaintiff a fee for successfully finding a buyer for defendant's engineering firm. Defendant moved for summary judgment arguing that plaintiff was precluded by the Act from bringing the action because plaintiff was not licensed under the Act. The trial court denied the motion, and on appeal the Michigan Court of Appeals reversed. In doing so, the court looked to both the nature of the activities performed and the character of the property involved. *Cardillo,* 377 N.W.2d at 413. The plaintiff in *Cardillo,* was hired in the traditional broker role. His job was to find a buyer for the engineering firm. THI, on the other hand, was engaged for the purpose of examining various furniture manufacturers, analyzing their product line, their financial status and their manufacturing, marketing and distributional systems. On one occasion Turner was asked to contact "brokers" on the West Coast. THI then made recommendations to HMCC about possible acquisitions based on various criteria such as the compatibility of the target company with

HMCC's current product line and distribution system. THI was advising HMCC on the best use for its surplus cash, a financial, internal corporate service traditionally performed by investment bankers. There was also some evidence that Turner advised Miller on personal estate matters whereby cash generated by business successes could go directly to the next generation thereby saving additional taxes. The combination of these duties and responsibilities differs from the role in which the plaintiff in *Cardillo* served. It also differs from the role of "broker" as the term is used in the Act.

The language of the statute speaks of real estate brokers as including a person who "buys or offers to buy, sells or offers to sell ... or negotiates the purchase or sale ... of a business...." There is no evidence in the record to support a finding that THI was engaged in any of these activities. THI's role was to identify and advise. In their pretrial order the parties stipulated that THI in no way caused Beatrice to divest itself of Hekman. They also stipulated that THI did not influence HMCC in its selection of Hekman and did not participate in any negotiation between HMCC and Beatrice.

Finally, the activities of the major banking firms in arranging mergers and takeovers are clearly not within the ambit of a "real estate broker regulation." This conclusion is supported by the real estate licensing requirements provided for in the Act. They are not, in any way, related to the services which investment bankers perform. For example, to obtain a license the Act requires 90 hours of classroom training in real estate, nine hours of which must be in civil rights law, and equal opportunity in housing.

Furthermore, the statute applied in *Cardillo* and *Lakeshore,* M.C.L. § 451.-201, *et seq.,* has been repealed by the Michigan Legislature. P.A. 1980, No. 299, § 2601 (effective October 21, 1980). It was replaced by the present version of the "Real Estate Brokers Act." M.C.L. § 339.-2501, *et seq.* The earlier version of the statute provided that "the commission of a

single act prohibited hereunder shall constitute a violation." M.C.L. § 451.203. This language was added in 1937 in response to a line of Michigan cases which provided that in the absence of an express legislative intent to create liability for a single act, a license is not required for such isolated transactions. *See, Morris v. O'Neill,* 239 Mich. 663, 215 N.W. 8 (1927); *Miller v. Stevens,* 224 Mich. 626, 195 N.W. 481 (1923). The language creating liability for a single act was omitted when the statute was amended in 1980. The inescapable conclusion that one draws from this conspicuous omission is that "single acts" no longer constitute a violation of the Michigan Real Estate Brokers Act. There can be no question that there is but one acquisition by HMCC which could fall within the terms of the HMCC/THI contractual relationship. A single act. I am satisfied that that acquisition was outside the terms of the Michigan Real Estate Brokers Act.

Finally, it is apparent from both the language of the contract and Turner's background that THI was hired by HMCC because it could provide conventional investment banking services which are generally not within the expertise of a real estate broker. As was previously noted, Webb Turner has a B.A. in economics. He began his professional career as a management consultant in New York City in 1965. That career has included many years as the head of merger and acquisition departments for major investment banking firms including Bear, Stearns, and Kuhn, Loeb and Cummins, and Paine-Webber. In 1972 he began working with manufacturers and retailers in the furniture industry who were interested in mergers and/or acquisitions. Nothing in the record establishes that he has ever done the type of work which is contemplated by the Real Estate Brokers Act.

In addition, the contract between THI and HMCC states that THI's role was to "locate appropriate candidates for acquisition and to advise as to the best way to proceed." Its duties included

identify[ing] all public companies, divisions of public companies as well as all private companies which ... meet [HMCC's] acquisition criteria ... [and]

contacting these companies with a view towards obtaining the requisite financial and operating information for comparative analysis.

Neither Turner's background, which was instrumental in the hiring of THI by HMCC, nor the contract itself support HMCC's argument that the work which THI was hired to perform, and in fact performed, is covered by the Real Estate Brokers Act.

For the reasons set forth above I find that the activities of THI did not fall within the scope of The Michigan Real Estate Brokers Act and therefore plaintiff is not barred from bringing this suit by M.C.L. § 339.2512a.

What remains is for the court to decide whether HMCC owes THI a "success fee" because Hekman was "under consideration" during the term of their contract. The first task is to ascertain the meaning of the phrase "under consideration" within the context of the THI–HMCC contract. As a general proposition language in a contract is interpreted according to its ordinary meaning. *Restatement (Second) of Contracts* § 202 (1979); *see, e.g., Stott v. Stott Realty Co.,* 306 Mich. 492, 499, 11 N.W.2d 215, 218 (1943); *American Home Products, Co. v. Liberty Mutual Insurance Co.,* 748 F.2d 760, 765 (2d Cir.1984). Where the meaning of the language of the contract is plain and unambiguous the terms of the contract and the intent of the parties will be interpreted as being consistent with that language. *Williston on Contracts,* § 609 (3rd Ed.1961); *Birchcrest Building Co. v. Plaskove,* 369 Mich. 631, 637, 120 N.W.2d 819, 823 (1963).

However, "[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *McIntosh v. Groomes,* 227 Mich. 215, 218, 198 N.W. 954, 955 (1924). "Courts are governed by what the parties said and did, and not merely by their unexpressed subjective intent." *Fletcher v. Board of Education,* 323 Mich. 343, 348, 35 N.W.2d 177, 180 (1948). Although subordinate, it is still important that "a contract be construed as a

whole; that all its parts are ... harmonized so far as reasonably possible." *Associated Truck Lines v. Baer*, 346 Mich. 106, 110, 77 N.W.2d 384, 386 (1956) (citation omitted).

Defendant argues that the term "under consideration," as used in its contract with THI, is ambiguous. The term "ambiguous" is itself ambiguous in that Michigan law recognizes two types of ambiguity: patent and latent.

> A patent ambiguity is one apparent upon the face of the instrument, arising by reason of inconsistency, obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one.

*Zilwaukee Township v. Saginaw Bay City Railway Co.*, 213 Mich. 61, 69, 181 N.W. 37, 39–40 (1921). A latent ambiguity exists "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." *McCarty v. Mercury Metal Craft Co.*, 372 Mich. 567, 575, 127 N.W.2d 340, 344 (1964), *cert den sub nom Mercury Metal Craft Co. v. McCarty*, 380 U.S. 952, 85 S.Ct. 1085, 13 L.Ed.2d 969 (1965).

Clearly no patent ambiguity exists in the phrase "under consideration" as it is used in the THI–HMCC contract. There may, however, be a latent ambiguity. At trial plaintiff objected to the defendant's attempt to elicit information from Jack Miller on the purpose of the termination clause in the contract, and implicitly on the meaning of the phrase "under consideration." To determine the existence of a latent ambiguity the court must first examine extrinsic evidence to determine if in fact such evidence supports the contention that the language of the contract, under the particular circumstances of its formation, is susceptible to more than one interpretation. *Goodwin, Inc. v. Coe*, 392 Mich. 195, 209–210, 220 N.W.2d 664, 671 (1974); *McCarty*, 372 Mich. at 575, 127 N.W.2d at 344. If a latent ambiguity is detected, the court must again examine the extrinsic evidence to ascertain the meaning of the language

contained in the contract. *Goodwin, Inc.; McCarty.*

Miller testified that, in his mind, four conditions had to be met for him to believe that a company was "under consideration" and to trigger HMCC's obligation to compensate THI for its services. They were that:

1. the company must have been for sale during the term of the contract;

2. financial information must have been available about the company;

3. contact must have been established with officials of the target company; and

4. the target company must have been the subject of negotiation or reflection in terms of an appropriate purchase price.

This definition of "under consideration" is clearly narrower than the commonly understood meaning. Defendant also claimed that when the parties entered into the contract it was their intent that the purchase of another corporation was to occur "rapidly." The engagement letter from THI to HMCC does, in fact, mention some time periods within which it was "hoped" that an acquisition could be completed, but the contract does not contain anything which resembles a "time is of the essence" provision.

From this evidence, and based on several Michigan cases finding various words and phrases ambiguous (*see, eg.* cases cited in *Goodwin, Inc.*, 392 Mich. at 213, 220 N.W.2d at 673 (1974)) defendant asks this court to find that in this contract the phrase "under consideration" has a meaning different than its usual and ordinary meaning. Defendant also argues that the phrase could not possibly have had its ordinary meaning in light of the purpose of the contract, which defendant claims was a rapid acquisition of a furniture company.

 As noted above, the role of the court is to ascertain, and effectuate the intent of the parties at the time of contract formation. It is the expressed, and not secret intent which is operative. Where the language of the contract is clear on its face, the court looks to it to ascertain the parties' intent. Where, as here, a party claims that an ambiguity exists in the lan-

guage the court then looks to see if there is extrinsic evidence which supports this contention. However, one party's uncommunicated understanding concerning the specialized meaning of contract language is not binding on the other party. *Fletcher*, 323 Mich. at 348, 35 N.W.2d at 180. Therefore, Jack Miller's undisclosed and uncommunicated belief about what the words "under consideration" meant in the contract is not sufficient to establish the existence of a latent ambiguity. Nor am I convinced by the evidence that the parties intended to narrow the definition of "under consideration" because of HMCC's sense of urgency. I therefore find that the phrase is not ambiguous. As used in the contract between HMCC and THI the phrase "under consideration" has its ordinary meaning. *The Random House Dictionary of the English Language* (1967) defines consideration as "the act of considering; careful thought; meditation; deliberation." *Webster's Third New International Dictionary* (1966) defines consideration as meaning "observation, contemplation." *Roget's International Thesaurus* lists, as synonymous with the phrase "under consideration": "in question," "at issue," "on the agenda," "under investigation".

■ The evidence presented at trial clearly supports a finding that Hekman was "under consideration" during the term of the contract. According to their contract, THI's role in this relationship was to "locate appropriate candidates for acquisition, and to advise [HMCC] as to the best way to proceed towards one or more acquisitions." As the facts set forth above reflect, the acquisition of Hekman was the subject of much thought and deliberation by Miller and Turner. At HMCC's request, THI expended time, energy and expense ascertaining if Hekman was a desirable acquisition; whether it could be bought or "shaken loose" and whether it would come up for sale in the not too distant future. Hekman was at or near the top of HMCC's list of desirable acquisitions during the entire term of the contract. Its availability was frequently discussed and Turner was urged to pursue it. Hekman's name appeared frequently on memos and notes immediately following conferences between Miller and Turner. Hekman was clearly "under consideration" in the common, ordinary usage and understanding of these words. If Miller wanted to say something different, or give these words some technical, special meaning he could easily have so provided in the contract. Having failed to do so, he can not now ask the court to rewrite the contract for HMCC. Consequently, I find THI's efforts on behalf of HMCC sufficient to trigger HMCC's obligation under the termination clause of the contract to pay THI's fee.

Judgment shall be entered in favor of Turner Holdings, Inc. and against defendant Howard Miller Clock Company in the amount of $177,000, plus $968.44, representing uncontested expenses, plus interest from November 18, 1983. Costs to be taxed.

### APPENDIX

Turner Holdings Inc.

One Wall Street

New York, N.Y. 10005

———

(212) 785–1200

August 31, 1981

Mr. J.H. Miller

Howard Miller Clock Company

Zeeland, Michigan 49464

Dear Jack:

We are pleased to outline below our understanding of the basis of the formal working relationship, which we have previously discussed, between Howard Miller Clock Company (HMCC) and Turner Holdings, Inc. (THI) in connection with your acquisition program.

As your exclusive agent and in coordination with you, we will endeavor to locate appropriate candidates for acquisition, and to advise you as to the best way to proceed towards one or more completed transactions. You have agreed to reimburse THI for our reasonable out-of-pocket expenses incurred in connection with this project. We have also agreed that you will pay us a "success fee" upon consummation of any acquisition or investment in the furniture

manufacturing field. This fee is the customary fee of five percent of the first one million dollars of consideration, four percent of the next million, three percent of the next million, two percent of the next million and one percent of any excess over four million dollars. There will be no distinction in the fee between companies suggested by THI and those suggested by or through Howard Miller Clock Company.

In the event that the consideration is other than cash, the fee computation will be based upon the fair market value of the consideration. The above fees do not include any legal, accounting, or financing fees which may be incurred by you as a consequence of our working together. Such legal, accounting, or financing fees will be agreed to by you in advance if incurred by us for you. You shall not be under any obligation to negotiate with any company introduced during the term of this agreement and we shall not be entitled to any compensation with respect to any introduction which for any reason does not lead to a consummated transaction.

*Phase I.* During this phase THI will attempt to identify all public companies, divisions of public companies, as well as all private companies which fall into the categories which we have isolated as being of particular interest, and at the same time meeting the acquisition criteria that you have outlined.

We will then promptly work towards contacting these companies with a view towards obtaining the requisite financial and operating information for comparative analysis. Hopefully, the final result of this process would be to arrive at a group of five to ten companies that would best fit your external growth objectives and decide what is the most effective way of pursuing them. We would intend to accomplish this phase of the project in approximately two to three months time from the commencement of this agreement.

*Phase II.* During this phase THI and HMCC will pursue the companies determined to be most desirable. Our experience is that with reasonable fortune and good focus we should be moving towards an agreement in principal within two to four months, assuming we successfully deal with the issue of price. The actual first closing would typically require another sixty to ninety days.

*Phase III.* In parallel with the steps leading up to the first closing, we would begin to develop appropriate strategy for the follow-on acquisition(s). If opportunistically the initial purchase turns out to be case goods, we would then try to determine whether occasional could be added internally or through purchase.

*Phase IV.* Similarly, the entire strategy for rounding out the line with upholstery furniture would then be followed.

The overall objective would be to put together a group of companies that will better control their distribution, and therefore the resulting profit margins and return on invested capital. Working together we should strive to achieve a base of fifty to one hundred million dollars of furniture sales within five to seven years.

In entering into this agreement with THI you acknowledge that much of the information and insights that will be made available to HMCC are proprietary to THI. Therefore, you agree to treat all material in strictest confidence and only provide access to such information on a need to know basis to your lawyers, accountants and bankers, when we are in actual negotiations, limiting the use of actual company names as much as is practical.

This agreement may be cancelled by either party, upon thirty days written notice. HMCC will continue to be obligated to THI for "success fees" for a period of two years beyond the termination date for any company that has been under consideration.

If the foregoing is your understanding of our working arrangements, please sign and return the enclosed duplicate original of this letter.

Sincerely,
Webb W. Turner

Howard Miller Clock Company

/s/ J.H. Miller
By:

11–3–81
Date

Amendment

September 29, 1981

Further, until such a time as either party should terminate this agreement, THI will not act on behalf of any other third party buyer of furniture manufacturing companies. We may, however, from time to time represent furniture companies which may be for sale, in which instance we would promptly bring such opportunity to you for your consideration.

The above notwithstanding, THI need not present to HMCC companies in which we have an interest for our own account, or in which we would take a substantial interest.

/s/ J.H. Miller
Howard Miller Clock Company
11-3-81

---

Webb W. Turner