851 F.Supp. 850 (1994)
PIERSON SAND & GRAVEL, INC., a Michigan corporation, Plaintiff,
v.
PIERSON TOWNSHIP, a Michigan municipal corporation; Occidental Chemical Corporation, a New York corporation; Wacker Silicones Chemical, a Delaware corporation; Stauffer Chemical Company, a Delaware corporation; Keeler Brass Company, a Michigan corporation; Chemetron Investments, Inc., a Delaware corporation; and BASF Corporation, a Delaware corporation, Defendants.
PIERSON TOWNSHIP, Counter-Plaintiff and Third-Party Plaintiff,
v.
MICHIGAN DEPARTMENT OF NATURAL RESOURCES, et al., Third-Party Defendants.
BASF CORPORATION, Cross-Plaintiff,
v.
CHEMETRON INVESTMENTS, INC., Cross-Defendant.
BASF CORPORATION, Third-Party Plaintiff,
v.
CHEMETRON CORPORATION, a Delaware Corporation; Allegheny Ludlum Industries, Inc., a Pennsylvania Corporation; Sunbeam-Oster Company, a Delaware Corporation, Third-Party Defendants.
No. 1:89-CV-729.
United States District Court, W.D. Michigan, S.D.
March 30, 1994.
*851 *852 Douglas A. Springstead, Springstead & Jaunese, PC, Fremont, MI, John D. Tully, *853 Warner, Norcross & Judd, Grand Rapids, MI, for plaintiff Pierson Sand & Gravel, Inc.
Daniel K. Reising, Sanders & Stein, PC, Grand Haven, MI, for defendant Pierson Tp.
Teresa S. Decker, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for defendant Keeler Brass Co.
Susan J. Sadler, Amy Bateson, Clark, Klein & Beaumont, Bloomfield Hills, MI, for defendant BASF Corp.
David G. Ries, Ronald C. Gahagan Jr., Joseph R. Brendel, Thorp, Reed & Armstrong, Pittsburgh, PA, for defendant Chemetron Investments Inc.

MEMORANDUM OPINION
McKEAGUE, District Judge.
This is a private remediation cost recovery action under CERCLA, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq. Plaintiff Pierson Sand & Gravel, Inc. ("Pierson Sand"), alleges it has incurred expenses in excess of $5.2 million in removing hazardous wastes from, and remediating their effects at, a site owned by it in Pierson Township, Montcalm County, Michigan. Pierson Sand alleges the hazardous substances were deposited there prior to its purchase of the site in 1984. Included among those named as responsible parties are defendants Pierson Township, Keeler Brass Company and Chemetron Investments, Inc. Now before the Court are these parties' cross-motions for summary judgment. Also before the Court is the motion of BASF Corporation, a settling defendant, for summary judgment on its cross-claim for indemnification against defendant Chemetron Investments.

I
The site purchased by Pierson Sand is known as the Central Sanitary Landfill. Refuse had been disposed of there since 1959, but no operator of the landfill had ever been authorized to accept hazardous wastes. In 1976, however, highly toxic "C-series" industrial wastes were discovered at the site.
The Michigan Department of Natural Resources ("DNR") supervised the ensuing cleanup. When Pierson Sand purchased the site in 1984, it was assumed that hazardous materials had been removed or reasonably contained. Pierson Sand continued to operate the site as a landfill but did not accept hazardous wastes. Nonetheless, in 1987, Pierson Sand was notified that groundwater in the area of the landfill evidenced contamination and the landfill was the suspected source. Pierson Sand, as owner, has been required by the DNR to remediate the site, a process which continues.
During remediation, Pierson Sand has uncovered evidence that defendants Pierson Township, Keeler Brass and Chemetron Investments may have contributed to the contamination. It appears Pierson Township leased the site or a portion of it from its owner, Floyd Bradley, as early as 1959. The Township conjunctively contracted with Mr. Bradley to permit and oversee the disposal there of Township residents' household refuse. During the next 12 years, the operation of the dump at the Bradley site steadily expanded, permitting access to non-residents as well. While Pierson Sand alleges that industrial wastes were disposed of at the site during the 1960's, there is no contention that the Township itself ever disposed of or arranged for the disposal of industrial waste at the site. The Township's involvement with operation of the site appears to have ceased in 1971. At that time, Montcalm County negotiated an agreement with the landfill operators whereby residents of six local municipalities, including Pierson Township, were permitted to dispose of waste. Between 1959 and 1971, Pierson Sand alleges, hazardous wastes in the form of barrels, household batteries and car batteries were deposited at the site. Batteries contain hazardous materials such as lead, a contaminant that has been identified in the soil and groundwater at the site. Pierson Township is said to be liable as an "operator" of a facility where hazardous substances were disposed of. 42 U.S.C. § 9607(a)(2).
Excavation at the site also uncovered four 55-gallon drums labeled "Keeler" or "Keeler Brass Company," containing hazardous materials of the kind identified in the soil and groundwater at the site. Keeler is a western *854 Michigan manufacturer engaged in the production and plating of automotive and furniture hardware. Keeler is alleged to be liable for having "arranged" for the transportation or disposal of hazardous wastes. 42 U.S.C. § 9607(a)(3). Keeler admits that it used the services of Approved Industrial Removal ("AIR"), which allegedly deposited hazardous wastes at the site, but denies that it ever arranged for AIR to dispose of wastes at the site and denies that AIR ever disposed of Keeler wastes at the site. Keeler also denies that the wastes contained in the drums were generated by it, contending such wastes are typical manufacturing wastes not uniquely attributable to Keeler.
Pierson Sand's case against Chemetron Investments is very similar. Chemetron formerly operated a manufacturing facility in Holland, Michigan, which produced color pigments for printing inks, paints, and other coatings. The assets of the Holland plant were purchased by BASF Corporation in 1979. Seven drums labeled "Chemetron Corp." or "Chemtron Corp." were also uncovered at the landfill site. These drums contained hazardous materials of the kind detected in the surrounding soil and groundwater. Like Keeler, Chemetron admits that it used AIR to dispose of waste solvents generated in Holland, but maintains there is no evidence that AIR transported Chemetron wastes to the site.

II
The parties' cross-motions for summary judgment ask the Court to evaluate the factual support for their claims and defenses. The Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2506, 91 L.Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id., 477 U.S. at 247-248, 106 S.Ct. at 2510 (emphasis in original). If a movant carries its burden of showing there is an absence of evidence to support a claim or defense, then the opponent must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could find for its proponent. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. Id. A complete failure of proof concerning an essential element of a claim or defense necessarily renders all other facts immaterial. Celotex, supra, 477 U.S. at 322-23, 106 S.Ct. at 2552-53.

III
In order for a private plaintiff to recover costs incurred in remediating hazardous contamination under CERCLA § 9607 it must first establish a prima facie case by showing that: (1) the clean-up site is a "facility"; (2) there is a "release" or threatened release of hazardous substances at the facility; (3) the release or threatened release caused the plaintiff to incur response costs; (4) the responsive actions taken and the costs incurred were necessary and consistent with the National Contingency Plan; and (5) the defendant is a "covered person." B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2nd Cir.1992); Sherwin-Williams Co. v. City of Hamtramck, 840 F.Supp. 470, 474 (E.D.Mich.1993); Abbott Laboratories v. Thermo Chem. Inc., 790 F.Supp. 135, 138 (W.D.Mich.1991). The defenses raised here call the last two elements into question.
There is no dispute that the landfill site is a facility, that a release of hazardous substances has occurred, and that Pierson *855 Sand has incurred response costs. However, all three of the moving defendants contend they are not "covered persons." Pierson Township contends Pierson Sand has failed to present facts sufficient to create a genuine issue on the allegation that the Township was an "operator" of the facility. Citing B.F. Goodrich Co. v. Murtha, supra, 958 F.2d at 1199, the Township argues that it did not become an operator by virtue of having leased the property and having contracted with its owner to operate the landfill. Whether the Township was actively involved in the day-to-day management of the landfill's operation, the fact remains that it appears to have had the authority to control the operation. This authority is sufficient to confer operator status. See Nurad Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir.1992).
Moreover, the Court has already ruled that the Township was an operator. Opinion, Honorable Richard A. Enslen, dated March 2, 1990, p. 6. The Township offers no compelling reason to revisit and disturb this ruling. Absent extraordinary circumstances, the Court is justifiably loathe to depart from this settled "law of the case." See Moses v. Business Card Express, Inc., 929 F.2d 1131, 1137 (6th Cir.1991); United States v. Todd, 920 F.2d 399, 403 (6th Cir.1990).
Keeler and Chemetron also contest the charge that they are "arrangers." One who arranges for disposal or treatment, or for transport for disposal or treatment, of hazardous substances is a "covered person." 42 U.S.C. § 9607(a)(3). Both Keeler and Chemetron admit that they arranged for the transport for disposal, of hazardous wastes by AIR. Both deny that they specifically arranged for AIR to transport such wastes to the Central Sanitary Landfill and both deny that their wastes were deposited there. That drums bearing their labels were discovered at the site is said to be inconclusive and only speculative support for Pierson Sand's claims against them.
The Court agrees that the evidence connecting Keeler and Chemetron to the contamination at the landfill site is not conclusive. "Arranger" liability must be premised upon the showing of a sufficient nexus between the defendant and the complained of hazardous substances. General Electric Co. v. AAMCO Transmissions, Inc., 962 F.2d 281, 286 (2nd Cir.1992); CPC International, Inc. v. Aerojet-General Corp., 759 F.Supp. 1269, 1278-79 (W.D.Mich.1991). This nexus may be established by showing actual involvement in the decision to dispose or by showing an obligation to control the hazardous substances. United States v. Fleet Factors Corp., 821 F.Supp. 707, 724 (S.D.Ga. 1993). Thus, the defendant need not have been actively involved in decisions regarding the timing, manner or location of disposal to be liable as an arranger. General Electric, supra, 962 F.2d at 286; CPC Int'l, supra, 759 F.Supp. at 1279. Arranger liability may attach even though the defendant did not know the substances would be deposited at a particular site or in fact believed they would be deposited elsewhere. United States v. Hardage, 761 F.Supp. 1501, 1511 (W.D.Okl.1990). A party that has used or generated hazardous substances cannot escape liability by contracting away its responsibility and then closing its eye to the method of disposal. CPC Int'l, at 1279. Viewing the controverted and inconclusive factual support for the parties' claims and defenses in the light of these standards, it is clear only that genuine issues of fact remain as to whether Keeler and Chemetron can be held liable as arrangers. None of the parties is entitled to a ruling as a matter of law on this point.

IV
The moving defendants also contend that Pierson Sand's response actions were not consistent with the National Contingency Plan ("NCP"). Consistency with the NCP is an essential element of a private plaintiff's prima facie case. Donahey v. Bogle, 987 F.2d 1250, 1255 (6th Cir.1993); Sherwin-Williams Co. v. City of Hamtramck, supra, 840 F.Supp. at 474. Pierson Sand has the burden of showing compliance with the NCP requirements.
The NCP is a series of regulations promulgated by the Environmental Protection Agency. The regulations establish criteria and provide guidance for site evaluation and *856 cost effectiveness, planning of cleanup actions, and consideration of alternative remedial options. Channel Master Satellite v. JFD Electronics Corp., 748 F.Supp. 373, 382 (E.D.N.C.1990). The NCP requirements relevant to this private cost recovery action are set forth at 40 C.F.R. § 300.700(c).[1] A private party response action is considered "consistent with the NCP" if it, when evaluated as a whole, is in substantial compliance with the applicable requirements. 40 C.F.R. § 300.700(c)(3)(i). Such an action will not be considered "not consistent with the NCP" based on "immaterial or insubstantial deviations." 40 C.F.R. § 300.700(c)(4).
Among the applicable requirements, "private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(6). In the preamble of the 1990 NCP, the Environmental Protection Agency emphasized the importance of this requirement:
Public participation is an important component of a CERCLA-quality cleanup, and of consistency with the NCP. The public  both PRP's [potentially responsible parties] and concerned citizens  have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups  which are performed without governmental supervision  are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA.
55 Fed.Reg. 8795, March 8, 1990. Courts have thus consistently held that failure to provide public comment opportunity renders remedial action inconsistent with the NCP and bars recovery of costs. County Line Investment Co. v. Tinney, 933 F.2d 1508, 1514 (10th Cir.1991); Sherwin-Williams, 840 F.Supp. at 476.
The moving defendants contend Pierson Sand never substantially complied with this requirement. Pierson Sand maintains that opportunity for public comment was provided on two occasions. On August 16, 1989, a public hearing was conducted by the DNR concerning Pierson Sand's application to expand its landfill operation. The public notice of the hearing indicated its purpose was to discuss the proposed expansion. The introduction to the hearing also described its purpose specifically:
The purpose of this hearing as previously stated is to receive public comment relative to the expansion of the existing facility. Statements regarding this matter are the only statements we can accept at this hearing.
Tr. of Hrg., August 16, 1989, p. 2. Pierson Sand argues nevertheless that remediation of existing contamination was an element of the proposal and that those attending received information regarding remediation plans.
The Court has reviewed the 23-page transcript of the public hearing. It began with a statement from a DNR official acknowledging the application was unique because the plan necessarily included remediation of existing groundwater contamination. He explained that the DNR had yet to review the remediation proposal, but would have to approve it and incorporate appropriate requirements into an enforceable consent order before the application would be granted. Representatives of Pierson Sand then offered a summary description of the expansion and remediation plan, identifying the nature and suspected sources of existing contamination and describing the manner in which the site would be excavated and contaminants removed. A Township representative also spoke, detailing several concerns and requesting additional information. The remainder of the hearing consisted of relatively short statements of some 22 local residents expressing concerns and opinions about the proposed expansion.
The hearing included no discussion or analysis of response action alternatives; no discussion of the environmental impact of the existing contamination or of the proposed remediation; no discussion of cost-effectiveness. *857 To the extent that proposed remedial activities were implicated, the attending public did not even have the benefit of DNR review and evaluation, such review having not been performed at that time. Consistent with the explicit limited purpose of the hearing, to discuss Pierson Sand's application for expansion, no meaningful "opportunity for public comment concerning the selection of the response action" was given. The August 16, 1989 hearing, though it offered opportunity for public comment on related matters, ultimately had nothing to do with the fundamental purpose underlying the NCP: the responsible selection of one among several response actions. This shortfall is not merely an "immaterial or insubstantial deviation;" it is a fundamental defect. The August 16, 1989 hearing does not suffice to bring Pierson Sand's response action into substantial compliance with the NCP requirements.
Pierson Sand points to a second public meeting, purportedly conducted in November 1990. Notice of the meeting appeared in the November 12, 1990 edition of "The River Valley Shopper" at p. 17A:

PUBLIC INVITED
Monday, November 19, 1990, 7:00 p.m.
Mr. Terry Hartman, DNR and Representative of Central Sanitary Landfill will respond to residents' questions and concerns regarding activity at CSL in Pierson Township.
The ad gives no notice of the location of the meeting and describes the meetings's purpose only very generally. Further, the deposition testimony of John A. Keener of Central Sanitary Landfill indicates the meeting did not take place at the noticed time anyway. It was postponed for approximately one month to accommodate hunting season.
According to Keener, the Township Board called the special meeting for the purpose of discussing the cleanup at the landfill. He described the meeting: "We had the drainage and the layout showing the remediation system and that, and we presented it and we took questions and that from the general public at that meeting." Keener Dep.Tr. p. 57. This characterization of the meeting is disputed by three Township officials who were present. They recall that the meeting was called to discuss the expansion construction, not remediation. Declarations of Howard Sagorski, Township Supervisor; William Paepke, Trustee; and Nancy Maioho, Township Clerk. They recall that the remediation plan was not presented to the public for comment or review.
This appears to be all the information available about the meeting that took place in about November or December 1990. It does not satisfy Pierson Sand's burden of proof. Even accepting Keener's characterization, the meeting can hardly be deemed to have afforded the public a meaningful opportunity to participate in selection of the appropriate response action. First of all, notice of the meeting's time, place and purpose appears to have been woefully inadequate. Second, the meeting took place at least one month after the remediation plan had already been established and adopted in a consent decree, entered in the Ingham County Circuit Court on October 18, 1990. Any input that potentially responsible parties or concerned citizens could have had at the meeting would thus appear to have been purely academic, not "meaningful." This is not the sort of public participation contemplated by the NCP.
The two public meetings relied upon by Pierson Sand, whether viewed separately or conjunctively, do not approach the "substantial compliance" threshold. The present facts stand in marked contrast to those found to constitute substantial compliance in Louisiana-Pacific Corp. v. Asarco Inc., 6 F.3d 1332, 1341-42 (9th Cir.1993) (six well-advertised public meetings; two of which came after publication of a feasibility study outlining cleanup options, and all of which preceded the final response action decision). They are more akin to those found insufficient in Sherwin-Williams, supra, 840 F.Supp. at 476-78 (involvement of state and local governments no substitute for public comment).
Pierson Sand has plainly failed to carry its burden of showing substantial compliance with the NCP. As to this failure to establish an essential element of its prima facie case, there is no genuine issue of material fact. Pierson Sand's response costs are therefore *858 not recoverable and defendants Pierson Township, Keeler and Chemetron are entitled to summary judgment in their favor.

V
Finally, settling defendant BASF Corporation seeks summary judgment on its cross-claim for indemnification against defendant Chemetron. BASF is named as a defendant in this action solely as a "successor" to any liability that Chemetron may have for Pierson Sand's response costs. BASF is alleged to be a successor because it had purchased certain assets from Chemetron in 1978, including its Pigments Division plant in Holland, Michigan. Plaintiff Pierson Sand alleges Chemetron wastes generated at the Holland plant were disposed of at the Central Sanitary Landfill site. BASF had consistently denied that Chemetron was liable for Pierson Sand's response costs or that it was liable as successor. Nonetheless, BASF recently entered into a settlement agreement with Pierson Sand, obliging itself to pay money for which it asserts a right of indemnification from Chemetron.
This right is contractual. BASF relies on paragraph 16 of the Assets Purchase Agreement between the parties dated November 17, 1978. Under paragraph 16, in pertinent part, Chemetron "agreed" to indemnify BASF against all losses, liabilities, costs, damages and expenses resulting by reason of any attempt to collect from or assert against BASF any obligation or liability of Chemetron not expressly assumed by BASF.
Relying on the express terms of the same Purchase Agreement, Chemetron contends any duty to indemnify expired three years after the March 23, 1979 closing of the Agreement. Paragraph 15 of the Agreement provides in part:

Survival of Representations. The representations, warranties and agreements contained in this Agreement and in any certificates delivered pursuant hereto shall survive the closing date and shall remain in full force and effect thereafter for a period of three years, regardless of any investigation made by or on behalf of any party hereto, but subject to all limitations and other provisions contained in this Agreement; ...
Chemetron contends the paragraph 16 duty to indemnify is an "agreement" subject to the time limitations of Paragraph 15.
BASF argues the "representations, warranties and agreements" referred to in paragraph 15 are specially and exclusively defined in paragraph 1, entitled "Representations, Warranties and Agreements of Parent and Seller." Paragraph 1 consists of some 26 pages of verbiage without reference to indemnification. Therefore, BASF argues, the indemnification agreement of paragraph 16 is not the sort of agreement contemplated by the parties under paragraph 15.
The parties' conflicting positions present a question of contract interpretation. As a general rule under Michigan law, contract language is interpreted according to its ordinary meaning. Turner Holdings, Inc. v. Howard Miller Clock Co., 657 F.Supp. 1370, 1378 (W.D.Mich.1987). That is, the parties' intent is deemed to have been consistent with the ordinary meaning of the plain and unambiguous terms they chose to express their agreement.
Contracts that are unambiguous are not open to construction and must be enforced as written, Cochran v. Ernst & Young, 758 F.Supp. 1548, 1554 (E.D.Mich. 1991); Commercial Movie Rental v. Larry Eagle, Inc., 738 F.Supp. 227, 230 (W.D.Mich. 1989). If the contract terms are not ambiguous, then contradictory inferences that may be drawn are subjective and irrelevant. Cochran, supra.
Here, BASF's argument is not supported by the contract language. The indemnities provision is couched in "agreement" language. The time limitation of paragraph 15 pertains to "representations, warranties and agreements contained in this Agreement," not just to those agreements contained in paragraph 1. "This Agreement" indisputably refers to the 84-page Purchase Agreement, of which the indemnities provision is part. Nothing in the language of paragraph 1 or of paragraph 15 compels or even suggests the conclusion that the three-year limitation period was not intended to apply to *859 enforcement of Chemetron's agreement to indemnify. Nor does application of the limitation period to the agreement to indemnify create any internal inconsistency in the Agreement. Whether the Agreement language is considered particularly or as a whole, it reflects the same understanding: claims for enforcement of Chemetron's indemnification agreement must have been brought within three years after the closing.
BASF has not offered extrinsic evidence suggesting the existence of a latent ambiguity that might call the plain meaning of the Agreement into question. Cf. Turner Holdings, supra, 657 F.Supp. at 1379. Nor has BASF even argued that the Agreement does not fully embody the parties' understanding. Cf. Goodwin v. Coe Pontiac, 392 Mich. 195, 204, 220 N.W.2d 664 (1974).
The Court therefore concludes the Agreement is not susceptible of more than one reasonable interpretation. See Raska v. Farm Bureau Mutual Ins. Co., 412 Mich. 355, 362, 314 N.W.2d 440 (1982). It is unambiguous on its face and must be, as a matter of law, enforced as written. In re Loose, 201 Mich.App. 361, 366, 505 N.W.2d 922 (1993). Accordingly, the Court concludes under the terms of the Agreement that BASF's claim for indemnification is barred by the three-year limitation period. There being no genuine issue of material fact, defendant Chemetron is entitled to summary judgment.

VI
In sum, the Court has reached the following conclusions: (1) the motion of Pierson Sand & Gravel for summary judgment against defendants Pierson Township, Keeler Brass Company and Chemetron Investments, Inc., must be denied; (2) the motions of Pierson Township, Keeler Brass Company and Chemetron Investments, Inc., for summary judgment against Pierson Sand & Gravel must be granted; (3) the motion of BASF Corporation for summary judgment against Chemetron Investments, Inc., must be denied; and (4) Chemetron Investments, Inc., is entitled to summary judgment in its favor on BASF Corporation's claim for indemnification[2] A judgment order consistent with this opinion shall issue forthwith.

JUDGMENT ORDER
In accordance with the Court's Memorandum Opinion of even date,
IT IS HEREBY ORDERED that the motion of Pierson Sand & Gravel, Inc. for summary judgment on its claims against defendants Pierson Township, Keeler Brass Company and Chemetron Investments, Inc., is DENIED.
IT IS FURTHER ORDERED that the motions of defendants Pierson Township, Keeler Brass Company and Chemetron Investments, Inc., for summary judgment on the claims made against them by Pierson Sand & Gravel are GRANTED. Summary Judgment is, accordingly, hereby AWARDED to defendants Pierson Township, Keeler Brass Company, and Chemetron Investments.
IT IS FURTHER ORDERED that the motion of BASF Corporation for summary judgment on its cross-claim against Chemetron Investments is DENIED. SUMMARY JUDGMENT on this claim is instead AWARDED to Chemetron Investments.
NOTES
[1] The Court applies the 1990 version of the NCP. It became effective on April 9, 1990 and applies to cleanups that were already underway at that time. Sherwin-Williams, supra, 840 F.Supp. at 476; Tri-County Business Campus v. Clow Corp., 792 F.Supp. 984, 990 (E.D.Pa.1992).
[2] This procedure is clearly proper, though Chemetron has not moved for summary judgment, because BASF has had abundant opportunity to demonstrate the existence of a genuine issue of material fact and cannot legitimately claim it is unfairly surprised by this result. See 6 Moore's Federal Practice, 2nd ed., ¶ 56.12.