ORDER

SAM H. BELL, District Judge.
Presently before the Court are Defendant Roger Gregory’s motion for summary judgment (docket #27) and Defendants Peter Steck and RST Mespo’s motion for summary judgment (docket #30).

STATEMENT OF FACTS

On April 23, 1992, Plaintiff John Russell reserved a room at the Truebrooke Inn, an establishment in which Russell owned an interest, and which is located in Mesopotamia, Ohio. Russell spent most of the afternoon drinking at the Inn. By evening, he had become disorderly, and he started an argument with the manager, Defendant Peter Steck, concerning the Inn’s business operations. Eventually, Steck contacted the Trumbull County Sheriffs Department, asking for assistance in settling a disturbance at the Inn.
Defendant Roger Gregory, a deputy sheriff, responded to Steck’s call shortly after six o’clock in the evening. Gregory spoke with Russell briefly and asked him to leave the Inn. According to Russell, rather than leave, he retired to his room. Gregory allegedly ordered Russell out of the room and told him to quit the premises. Russell desisted, claiming he was too intoxicated to drive. ■ He offered to remain in his reserved room or to sleep in his car until his inebriation had passed. Gregory escorted Russell to the latter’s car and, despite Russell’s renewed request to stay, insisted Russell leave the prop *862 erty. Russell got into his car and started toward his home in Chagrin Falls, Ohio. En route, he was stopped by the Geauga County Sheriffs Department and placed under arrest for driving while intoxicated. Russell was convicted in the Chardon Municipal Court, Geauga County and sentenced for three misdemeanors.
Russell filed this lawsuit on March 25, 1993, claiming that the defendants conspired to deprive him of his Fourteenth Amendment due process rights while acting under color of state law.

STANDARD OF REVIEW

The Court of Appeals for the Sixth Circuit recently summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56:
Summary judgment is appropriate where “there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law.” .... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party.
The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.
“By its very terms, this standard provides that the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.” The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict in favor for the nonmoving party. If the disputed evidence “is merely colorable or is not significantly probative, summary judgment may be granted.”
Leo LaPointe v. United Autoworkers Local 600, 8 F.3d 376 (6th Cir.1993) (citations omitted). With this standard in mind, the Court shall analyze the defendants’ present motions.

LAW AND ANALYSIS

RusseU’s single count complaint asserts a cause of action against each of the named defendants pursuant to 42 U.S.C. § 1983. He alleges that the defendants collectively deprived him of his liberty without affording him due process of law. In support of his motion, Gregory claims, inter alia, that he is immune from suit. Steck simply asserts a lack of evidence sufficient to sustain the claim against him.
Section 1983 provides a cause of action for an aggrieved party against one who deprived the claimant of protected rights while acting under color of state law. To maintain an action under this section, a person need prove two things. First, he must show that he has been deprived of rights, privileges or immunities secured by the Constitution and laws of the United States. Additionally, he must establish that the defendant’s acts, which allegedly deprived him of his protected rights, were performed under color of state law. Parrott v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); Zamlen v. City of Cleveland, 906 F.2d 209 (6th Cir.1990).
Gregory’s Motion
“Qualified or ‘good faith’ immunity is an affirmative defense that is available to government officials performing discretionary functions.” Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir.1992). A state official is entitled to qualified immunity if his allegedly unlawful conduct was objectively reasonable when considered in light of the legal rules that were clearly established at the time the challenged conduct was taken and the information possessed by the official. Id., quoting Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).
The comparison of those standards which guide our analysis concerning the issue of qualified immunity, as set forth in Anderson, supra, and its predecessor opinion in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), has been the subject of discussion by this Court in previous opinions. *863 For example, the Court in Martin v. City of Eastlake, 686 F.Supp. 620 (N.D.Ohio 1988) (Krenzler, J.), examined Anderson ⅛ modification of the qualified immunity analysis promulgated in Harlow. As Judge Krenzler observed, “The focus of the qualified immunity defense ... is not on whether the constitutional right was established or not, but is on whether a reasonable police officer would have believed that the actions violated clearly established constitutional rights.” Id. at 626 (emphasis in the original).
The Court initially considers whether Gregory’s alleged conduct in fact violated the provisions of the Fourteenth Amendment. If it did, the Court must then consider whether that conduct was based on a reasonable belief in its lawfulness. If, however, Gregory did not abridge a protected right, Gregory’s motion must be granted without further inquiry. Seigert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).
I. The Constitutional Right Asserted.
The Fourteenth Amendment to the United States Constitution makes it unlawful for any state to “deprive any person of life, liberty, or property, without due process of law....” U.S. Const, amend. XIV § 1. Among those liberty interests historically protected by due process is the right “to be free from ... unjustified intrusions on personal security.” Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977); see also, Youngberg v. Romeo, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). This interest, in the Court’s opinion, under-girds Russell’s instant claim.
A. DeShaney and its Progeny.
Much of the case law bearing upon this Court’s analysis of Russell’s claim derives from the Supreme Court’s opinion in DeShaney v. Winnebago County Social Services Department, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Plaintiffs in DeShaney, a mother and her child, sued a state child protection agency under § 1983 after the agency had returned the child to the custody of an abusive father, who ultimately beat the child, causing permanent brain damage. DeShaney, 489 U.S. 189, 109 S.Ct. 998. Plaintiffs. argued that the state actors had deprived the child of his constitutionally protected interest in maintaining freely his personal security. Id. at 195, 109 S.Ct. at 1002-03. Having once undertaken the child’s protection, the plaintiffs reasoned, the state assumed an affirmative duty—enforceable through the Due Process Clause— to maintain that protection. Id. at 197, 109 S.Ct. at 1004.
The DeShaney plaintiffs culled their “affirmative duty” argument from several decisions in which the Supreme Court articulated the state’s duty to act in the interest of an individual in certain limited instances in which the state has affirmatively restrained that individual’s liberty. See DeShaney v. Winnebago County Social Services Department, 489 U.S. 189, 198, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989), citing Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (held that due process prevents state from confining involuntarily committed persons in unsafe conditions); Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (held that under Eighth Amendment state must provide its prisoners adequate medical attention).
According to the Court, the DeShaney plaintiffs misconstrued the due process “duty to protect” identified in Youngberg and anticipated in Estelle:
The affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State’s affirmative act of restraining the individual’s freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the “deprivation of liberty” triggering the protection of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.
Id. 489 U.S. at 200, 109 S.Ct. at 1005-06. The Court found Estelle-Youngberg inapplicable to the facts presented in DeShaney since the state defendant in that case, al *864 though aware of the dangers the child faced with his father, “played no part in their creation, nor did it do anything to render him any more vulnerable to them.” Id. at 201, 109 S.Ct. at 1006.
The Supreme Court in DeShaney plainly sought to circumvent a wholesale expansion of the limited due process duty to protect; nonetheless, its description of that duty accommodates, and, indeed, appears to contemplate, enforcement of the duty in non-custodial settings. Thus, in DeShaney ⅛ wake, a number of courts have found a denial of due process, not only in situations in which a “special relationship” between the plaintiff and the state gives rise to an affirmative duty of care, but also in those instances in which the state, by its own actions, has created dangers threatening the plaintiffs life or liberty. See Reed v. Gardner, 986 F.2d 1122 (7th Cir.1993) (state actors created risk of danger to plaintiffs—highway travellers injured by drunk driver—, and thereby violated their Due Process Rights, by arresting sober driver and leaving obviously drunk driver at wheel in her stead); Salas v. Carpenter, 980 F.2d 299, 309 (5th Cir.1992) (“Courts have found a denial of due process when the state creates the faced dangers”); Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir.1992) (en banc) (due process clause places affirmative duty of care on state in situations in which the state affirmatively places a particular individual in a position of danger the individual would not have faced otherwise); Cornelius v. Town of Highland Lake, Alabama, 880 F.2d 348 (11th Cir.1989) (State action that places plaintiff in “special danger” subjects state actors to liability under 42 U.S.C. § 1983); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989) (officer who arrested driver and left passenger stranded in high-crime area, where she was eventually raped, violated passenger’s due process rights by placing her in a position of danger).
The above quoted passage from DeShaney gave rise to this line of opinions, confirming the suspicion raised by Ingraham that “the State’s affirmative act of restraining the individual’s freedom to act on his own behalf ... triggers] the protections of the Due Process Clause.” Focused as they are on state conduct which places an individual in danger— with scant or no reference to a concomitant failure to protect—these decisions descend directly from Ingraham, while sharing only a tangential relation with Estelle and Young-berg and the affirmative duty to protect adumbrated in those cases. As Justice Brennan observed in his dissenting opinion in DeShaney, “In a constitutional setting that distinguishes sharply between action and inaction, one’s characterization of the misconduct alleged under § 1983 may effectively decide the case.” 489 U.S. at 204, 109 S.Ct. at 1008 (Brennan, J., dissenting). Consistent with the referenced line of authority, we understand the question before us to be whether Defendant actively placed Russell in harms way—not whether Defendant failed to exercise an affirmative duty of care.
B. Applicable Authority from the Circuit Courts.
Walton v. City of Southfield, 995 F.2d 1331 (6th Cir.1993), required the Sixth Circuit Court of Appeals to consider whether police officers violated a minor’s Fourteenth Amendment liberty interest by abandoning the child in an unfamiliar area after arresting her guardian. Turning to DeShaney for guidance, the Court concluded that, while “DeShaney does not recognize a clearly established right not to be abandoned by the police.... neither does it foreclose the possibility that such a right could be clearly established if abandonment in a forlorn place were deemed a ‘restraint of personal liberty’ [akin to those restraints at issue in Estelle and Youngberg].” Id. at 1337. Since the case presented an issue of first impression in this Circuit, the Court turned to the decisions of other circuits to determine whether the right not to be abandoned in such circumstances existed.
Unfortunately, the Court in Walton ignored its own prior admonition, Silver v. Franklin Township, 966 F.2d 1031, 1035 (6th Cir.1992), and resolved the second prong of the qualified immunity analysis (whether a right was clearly established) without first stating whether a constitutional right existed at all. Because of conflicting decisions on the question among the Circuits, the Court *865 concluded simply, “the ‘contours of such a right,’ if there is such a right, were not sufficiently clear so that a reasonable officer would have known that leaving the children in the parking lot violated that right.” Walton, id. at 1339. Thus, the Court held the Walton defendants immune from suit.
Although it did not decide whether the particular conduct of the defendants before it was unconstitutional, the Walton court did imply—consistent with Ingraham and the weight of authority from other circuits—that state action, custodial or not,.which places an individual in a dangerous position violates due process so long as the challenged conduct is deemed a “restraint of personal liberty.” Id. at 1337. Thus, as stated above, the question before this Court is whether police conduct tantamount to forcing a person to drive while intoxicated constitutes such a restraint, and not—as Gregory would have it— whether a police officer has.an affirmative duty to protect an obviously drunk driver.
The Seventh Circuit’s recent decision in Reed bears directly on this issue. Plaintiff Richard Reed was the survivor-of an automobile accident caused when a drunk driver, Larry Rice, veered left of center on an Illinois highway and collided with Reed’s car. The collision killed Reed’s pregnant wife and seriously injured his child and several other passengers. Reed, 986 F.2d at 1123-24. A few hours before the accident, state troopers had arrested Rice’s companion, Cathy Irby. Id. at 1124. At the time of the arrest, Rice was riding as a passenger in Irby’s car. Id. The troopers took Irby into custody, but they left Rice alone with the car and its key, even though they had reason to know that he was intoxicated. It was Irby’s car Rice was driving when he hit the Reeds. Id.
Reed sued the troopers responsible for leaving Rice in possession of the automobile for allegedly infringing his and his decedent’s right to substantive due process. The district court dismissed Reed’s cause for failure to state a claim for deprivation of a constitutional right. Id.
Leaning heavily on DeShaney, the Seventh Circuit reversed, concluding “injured parties can state a claim under section 1983 when police officers arrest a sober driver and leave behind an obviously drunk passenger who takes the wheel.” Id. Critical to the court’s holding was its determination that the troopers’ conduct had actually placed the Reeds and others on the road in a worse position than they had previously encountered:
DeShaney and its progeny make it clear that the police have no affirmative obligation to protect citizens from drunk drivers. Taken to an extreme, police officers could watch drunk drivers stumble to their ears and drive off, weaving across the road, without incurring section 1983 liability. Similarly, if the defendants had failed to arrest Irby, they would have had no liability if she had exchanged places with Rice and he had driven headlong into the Reed’s ear. It was the police action in removing Irby, combined with their knowledge of Rice’s intoxication, which creates their liability for the subsequent accident.
Id. at 1125 (emphasis added).
In reaching its decision, the Reed court relied in part on Gregory v. City of Rogers, Arkansas, 974 F.2d 1006 (8th Cir.1992). Gregory, like Reed, was a ease in which a police officer was sued under § 1983 for leaving an intoxicated passenger in an automobile after arresting the driver. Id. at 1009. Gregory, Fields and Turner had spent an evening visiting several nightclubs. Although Gregory and Fields drank heavily, Turner remained sober to act as “designated driver.” Id. at 1008. The three eventually started toward home in Gregory’s car with Turner at the wheel. After Turner ran a red light, a local police officer stopped the car. The officer conducted a routine warrant check and discovered an outstanding warrant for Turner’s arrest. Id. At Turner’s request, the officer allowed Turner to drive separately to the police station to resolve the outstanding'warrant. Turner proceeded to the station and parked on the street in front of it, leaving Gregory and Fields—as well as the keys—behind in the car. Id. While Turner was inside with the arresting officer, Gregory elected to drive away from the station. He wrecked the car, thereby injuring Fields and killing himself. Id.
*866 Together with Gregory’s survivors, Fields sued the police officer, claiming he had deprived her of due process by placing her in danger. Id. at 1009. The district court granted summary judgment to the ' defendant. Id. The Eighth Circuit Court of Appeals, sitting en banc, superseded an earlier panel’s opinion, 921 F.2d 750 (1990), and affirmed the district court. Initially, the court concluded that the officer had no reason to know that Gregory and Fields were intoxicated and therefore unfit to drive. Id. at 1011. Moreover, even had he known as much, “a reasonable trier of fact could not find that Officer Howell affirmatively placed Gregory and Fields in" danger when ‘Gregory and Fields were left in the car, at the police station.” Id. Crucial to the Court’s determination were the actions of Turner, who, as the victims’ caretaker, had ample opportunity to make arrangements for their safekeeping or to restrain them from driving by removing the car keys. Id. at 1012. “Certainly, Officer Howell could not foresee Turner abdicating his responsibility as their designated driver, and it was his abdication that placed Gregory and Fields in danger, not Officer Howell’s performance of his official duty.” Id.
Two pre-DeShaney cases from within this Circuit illuminate the immediate inquiry. Nishiyama v. Dickson County, Tennessee, 814 F.2d 277 (6th Cir.1987) (en banc), stemmed from a Tennessee sheriff department’s practice of permitting a convicted felon within its custody to operate a patrol car without supervision. On one particular evening, a deputy sheriff allowed the inmate to drive him to his home in a marked patrol car. Once they reached the home, the deputy got out and instructed the inmate to return with the car to the county jail. Id. at 279. Instead of returning to the jail, however, the inmate cruised the local highways, occasionally flashing the patrol lights and stopping unsuspecting motorists. ' Eventually, he stopped Kathy Nishiyama and beat her to death. Id.
Nishiyama’s parents' brought suit against the county and its officers under § 1983, claiming that the responsible officers’ gross negligence had proximately caused their daughter’s death. A three member panel of the court reversed the district court’s dismissal for failure to state a claim. 779 F.2d 52 (1985). The majority of the court vacated the panel opinion but ultimately reversed the trial court’s order after hearing the case en banc. Nishiyama, 814 F.2d at 277.
Accepting as true the allegations in the plaintiffs’ complaint, the court stated: “We believe that the allegation in the present complaint of gross negligence on the part of the defendants was sufficient to charge them with the arbitrary use of governmental power.... These allegations are sufficient to state a claim for a substantive due process violation_” Id. at 282. In its closing summary, the court observed:
We hold that such reckless indifference to the risk posed by [defendants’] actions is sufficient to establish a violation of substantive due process under section 1983. It is particularly troubling when persons charged with ensuring public peace and order engender peril as a result of then-outrageous conduct.
Id. at 283. By predicating liability on the defendants’ “reckless indifference to the risk” of danger created by their conduct, the court in Nishiyama forecasted this Court’s use of a “creation of danger” analysis. The Eleventh Circuit' Court of Appeals realized as much, for it relied heavily on Nishiyama in Cornelius, in which case it concluded that local officials violated an employee’s constitutional rights by exposing her without adequate protection to the special dangers created by the presence of inmate laborers in the town hall. 880 F.2d at 354-355.
Estate of Tittiger by Tittiger v. Doering, 678 F.Supp. 177 (E.D.Mich.1988) involved a fact pattern quite similar to the one presented by this ease. According to the plaintiffs complaint, nineteen-year old Gregory Tittiger had attended a party on the night of July 14,' 1984. After drinking a substantial amount of alcohol, Tittiger obtained a ride with a fellow party-goer, Tim Klamik. Id. at 179.
Shortly thereafter, Police Officer Doering stopped Klamik’s car and asked Klamik to take several sobriety tests. After conducting the tests, Doering allowed Klamik to contin *867 ue on his way but told him to follow secondary roads. In addition, Doering instructed Tittiger to remove his bicycle from the rear of Klamik’s car and to ride it home, notwithstanding the fact that the bicycle had no lights. Id. Fifteen minutes later, Tittiger was struck and killed by another driver while riding his bicycle. Id.
Tittiger’s estate sued Doer pursuant to 42 U.S.C. § 1983, alleging, inter alia, that Doer had deprived Tittiger of life and liberty without due process of law. Doer moved to dismiss the claim pursuant to Federal Rule of CM Procedure 12(b)(6). Id. Relying, on the Sixth Circuit’s opinion in Nishiyama, the district court held that:
a ‘special relationship’ between a victim and the state, as required for a due process claim, is alleged sufficiently ... where the state actor is alleged to have placed the victim in the situation which caused his or her injury, and then to have failed to protect the victim.
Id. at 180. By forcing the intoxicated Tittiger to ride his unlit bicycle at night, the court ruled, Doer had placed Tittiger in a position of danger while doing nothing to protect him. Id. For this reason, the Court denied the motion to dismiss. Id.
C. Analysis of the Instant Cause.
The Fourteenth Amendment protects Russell’s historically rooted liberty interest in freedom from unjustified intrusions upon his personal security. Intentional state conduct that placed him in harms way and left him unable to act in his own best interest necessarily impinged upon that interest. The relevant case law from within and without this circuit leads the Court to conclude that this impingement—if proven—impermis-sibly violated the Fourteenth Amendment of the United States Constitution.
As was observed in Gregory, “[djrunken people are far less sympathetic plaintiffs than crime victims or young children....” 974 F.2d at 1014 (dissenting opinion). The innocent motorists in Reed and Nishiyama undeniably evoke greater compassion than does the present plaintiff. Likewise, the ultimate injuries suffered by those victims exceed immeasurably those complained of in this matter. Notwithstanding notions of natural justice, however, it is the state action creating a danger and not merely the scope of damages ultimately suffered that implicates due process considerations.
The actual risk of danger to the plaintiff caused by the defendant’s action in this case was as great as, or greater than, that spawned in Reed and Nishiyama. The decedents in the latter two cases were chance unfortunates among a host of potential highway victims. While Defendant Gregory’s alleged conduct created a foreseeable risk of injury to a similar host of unidentified travel-lers, it more obviously placed Russell himself in danger since he was a necessary party to any resulting accident or arrest.
The precedent setting authority from this circuit alone requires the court to acknowledge Russell’s Fourteenth Amendment claim. Although both Nishiyama and Tittiger rest on fairly loose conceptions of substantive due process which antedate DeShaney the significance each attributes to official conduct that puts another in danger anticipates and ultimately dovetails with the more precise Due Process inquiry announced by DeShaney and its progeny.
Moreover, were we without DeShaney and its direct descendants, we would nonetheless by compelled by Nishiyama to allow Russell to advance his substantive due process claim. On the evidence presented, a reasonable fact finder could conclude that Gregory acted with reckless indifference to the safety of Russell and countless others and in so doing abridged Russell’s right to substantive due process. Nishiyama, 814 F.2d at 283.
The considerations which shaped the Gregory decision are not present here. It must be noted that the Eighth Circuit expressly approved in Gregory its previous holding that the state assumes an affirmative duty of care in those situations in which state actors place individuals in danger. 974 F.2d at 1010. In that particular case, however, the court concluded that the risk of harm which confronted the intoxicated drivers was created by a third-party, who had neglected his responsibility to take his fellows home or to remove the car keys from their reach. There is no *868 such third-party in this case. According to disputed testimony, Russell was not merely left in his car as were the intoxicated drivers in Reed and Gregory. Rather, it is alleged that he was in effect forced by a law enforcement agent to drive while intoxicated, like the decedent in Tittiger, despite the fact that he made prior arrangements to avoid such an eventuality.
It may well be true that Gregory believed that he was showing kindness toward Russell by sending him away against his protestations instead of placing him under arrest. Whatever his motivation, however, Gregory purportedly “place[d] [Russell] in a position of danger that otherwise [he] would not have faced.” Reed, 986 F.2d at 1125. This Court must concur with the view expressed in Ni-shiyama: “It is particularly troubling when persons charged with ensuring public peace and order engender peril as a result of their outrageous conduct.” 814 F.2d at 283.
The Court’s ruling on this issue should in no way be construed to suggest that Gregory held a constitutional duty to prevent Russell from driving while intoxicated. We echo the Seventh Circuit’s statement in Reed: “De-Shaney and its progeny make it clear that the police have no affirmative obligation to protect citizens from drunk drivers.” 986 F.2d at 1125.
Likewise, the Court expressly rejects the notion that Gregory may be held liable under a common law negligence standard. Russell may recover on his claim only if he proves that Gregory, acting intentionally or with reckless indifference to the risk created, affirmatively placed Russell in a position of danger that he would otherwise not have faced. Nishiyama, 814 F.2d at 283; Gregory v. City of Rogers, Arkansas, 921 F.2d 750, 755-56 (8th Cir.1990), vacated by, Gregory, 974 F.2d 1006. Whether Russell’s decision to continue driving after leaving the inn was an intervening, independent source of danger or instead a foreseeable consequence given his diminished mental capacity is a question of fact to be resolved at trial.[1]
II. Clearly Established Rights.
Having found that Russell advances a legitimate constitutional claim, the Court must now consider whether, in light of the law as it was then clearly established, a reasonable officer in Gregory’s position on April 23, 1992 would or should have realized that his conduct violated a protected right. In determining the actual state of the law as established at the time in question, “the law of our circuit requires us to look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit Court of Appeals] and other courts within our circuit, and finally to the decisions of other circuits.” Daugherty v. Campbell, 935 F.2d 780, 784 (6th Cir.1991); Masters v. Crouch, 872 F.2d 1248, 1251-52 (6th Cir.1989).
Ingraham, DeShaney, Nishiyama and Tit-tiger all pre-date the 1992 incident by more than three years. In light of the standing decisions in Nishiyama and Tittiger, the Court believes a reasonable officer in Gregory’s position would or should have known that forcing a person to drive while intoxicated constitutes an unjustifiable intrusion on that person’s interest in personal security.
The terrible risks and potential consequences related to drunk driving are witnessed and discussed with increasing regularity in our society. If, as it has been held, a law enforcement officer should realize that he recklessly threatens others’ life and liberty interests by allowing a felon to operate a patrol car, he should also know that he creates a similar threat by forcing an intoxicated man behind the wheel—especially in light of the holding to this effect in Tittiger. Thus, Defendant Gregory cannot claim official immunity in this lawsuit.
III. Claim and Issue Preclusion.
In addition to raising the qualified immunity defense, Gregory argues that the doctrines of res judicata and collateral estoppel preclude Russell’s suit in light of Russell’s prior criminal conviction.
In determining whether to afford preclusive effect to a state court judgment, *869 the Court must first determine whether the courts of the state in which the judgment was entered would do so. Haring v. Prosise, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983). Under Ohio law, criminal convictions generally do not prevent a plaintiff from litigating facts previously determined in the criminal proceeding. Johnson v. City of Cleveland, No. 53241, 1988 WL 3749 (Cuyahoga Co.Ct.App. January 14, 1988); Western Casualty & Surety Company v. Martin, No. 1770, 1986 WL 6045 (Lawrence Co.Ct.App. May 28, 1986). Thus, Russell’s civil claim is not res judicata.
Concerning the specific issue of duress, Gregory has not demonstrated that this issue was actually raised and litigated in the course of the criminal proceeding. Accordingly, Russell is not collaterally estopped from arguing a similar issue in these proceedings. Johnson, 1988 WL 3749 at 7.
Finally, we note that, contrary to Gregory’s assertion, there exist genuine issues of material fact relating to the question of causation.
Steck’s Motion
In addition to Gregory, Russell has sued Steck and the partnership which owns the Truebrooke Inn, alleging that Steck joined with Gregory to force Russell onto the highway. A private citizen may be held liable under § 1983 for unlawful conduct undertaken willfully together with a state actor. Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980).
In support of his motion for summary judgment, Steck avers “at no time did affiant and the Trumbull County Sheriffs deputies reach an agreement, tacit or otherwise, regarding how Mr. Russell was to leave the Truebrooke Inn Premises.” Stack Aff., p. 3.
Having carefully reviewed Russell’s own affidavit, the Court concludes that he has failed to demonstrate by more than a mere scintilla of evidence that Steck was involved in the alleged decision to make Russell drive off of the premises. Russell’s sole testimony on the issue is as follows:
[A]t some point, it became apparent, through their respective words and actions, that Mr. Steck and Deputy Gregory had agreed, decided and were intent on his [Russell’s] immediately leaving the Inn premises in his car; he explained to them that he was drunk and couldn’t leave.... [Eventually, Russell] got into his car, in the presence of Deputy Gregory, and on information and belief, Mr. Steck, and drove onto and on a public highway....
Russell Aff., p. 2. Russell’s conclusory statements concerning Steck and Gregory’s alleged agreement are of no probative value in determining whether such an agreement actually existed. Moreover, Russell concedes that he has no personal knowledge of Steck’s presence outside of the Inn at the time of Russell’s departure. His “information and belief’ would seem to be inadmissible hearsay.
The Court finds no genuine factual issues concerning either Steck’s or the partnership’s involvement in the alleged constitutional deprivation. Accordingly, those parties’ joint motion for summary judgment must be granted.

CONCLUSION

For the foregoing reasons, Defendant Gregory’s motion for summary judgment (docket #27) is denied. Defendants Steck and RST Mespo’s motion for summary judgment (docket #30) is granted.
IT IS SO ORDERED.

. Plaintiff has not raised, and therefore the Court need not address, the question of whether Gregory violated Russell’s due process rights merely by forcing him to engage in unlawful conduct.