NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0582n.06

FILED
Aug 01, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TED GATZAROS, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| THE SAULT STE. MARIE TRIBE OF CHIPPEWA | ) | DISTRICT OF MICHIGAN |
| INDIANS, et al., | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: DAUGHTREY, CLAY and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge.** Ted and Maria Gatzaros (Plaintiffs) appeal the dismissal of their suit against the Sault Ste. Marie Tribe of Chippewa Indians (the Tribe) and the Kewadin Casinos Gaming Authority (the Authority). *See* Fed. R. Civ. P. 12(b)(6). They seek to recover approximately $74 million under a guaranty agreement that was signed by the Tribe and the Authority. For the reasons explained below, we AFFIRM.

## I. BACKGROUND

Plaintiffs owned a substantial membership interest in Monroe Partners, LLC, an entity that owned fifty percent of Greektown Casino, LLC, the operator of Greektown Casino in Detroit. When Plaintiffs decided to sell their interest, Monroe Partners, LLC agreed to redeem it for $265 million, to be paid to Plaintiffs over time in a series of "liquidation payments." To accomplish the redemption, Plaintiffs and Monroe Partners, LLC entered into an "Amended and

Restated Limited Liability Company Redemption Agreement" on July 28, 2000. The redemption agreement defined the "Redemption Amount" as $265 million dollars.

Contemporaneously with the redemption transaction, Monroe Partners, LLC sold Plaintiffs' redeemed membership interest to Kewadin Greektown Casino LLC for $265 million.[1] Monroe Partners, LLC accomplished the sale of Plaintiffs' interest through an "Amended and Restated Limited Liability Company Subscription Agreement" executed by Monroe Partners, LLC and Kewadin Greektown Casino LLC on July 28, 2000. The subscription agreement defined the "Subscription Amount" as "the Redemption Amount"; in other words, $265 million. In the subscription agreement, Kewadin Greektown Casino LLC agreed to pay Monroe Partners, LLC the amounts owed to Plaintiffs under the redemption agreement as those payments came due. The subscription agreement required Kewadin Greektown Casino LLC to obtain a limited guaranty agreement from the Tribe and the Authority binding them, with certain conditions precedent, to pay the subscription amount in the event that Kewadin Greektown Casino LLC defaulted on its obligations under the subscription agreement.

On the same day the redemption and subscription agreements were executed, the Tribe and the Authority executed the guaranty agreement. Paragraph 2 of the guaranty agreement provides (emphasis added):

> 2. **Funding Obligation**. *Subject to the limitations, terms and conditions set forth in this Guaranty Agreement,* the Sault Tribe and the Authority, for value received, jointly and severally, unconditionally and absolutely guaranty to fund the Subscription Amount, as and when due from the Subscriber under the Subscription Agreement, upon an event of default by the Subscriber in making payment of the Subscription Amount, as and when due, and receipt by the Guarantors of notice and demand from Monroe (the "Funding Obligations").

---

[1] Kewadin Greektown Casino LLC is not the same entity as Kewadin Casinos Gaming Authority. The latter entity is one of the named defendants in the lawsuit.

The Tribe and the Authority agreed to pay the subscription amount (the redemption amount of $265 million) if Kewadin defaulted on the subscription agreement.

The "limitations, terms and conditions" referred to in paragraph 2 of the guaranty agreement are found in paragraph 3, which provided that the Tribe and the Authority were obligated to pay under the guaranty agreement in the event of Kewadin's default on the subscription agreement only if the Tribe and the Authority had received payments from Greektown Casino in excess of certain thresholds. The Tribe and the Authority did not receive payments from Greektown Casino in excess of the thresholds specified in paragraph 3 of the guaranty agreement. Consequently, the obligation of the Tribe and the Authority to pay under the guaranty agreement was never triggered.

Plaintiffs received most of the payments due to them under the redemption agreement, but Kewadin Greektown Casino LLC ultimately breached its payment obligation under the subscription agreement with Monroe Partners, LLC. Monroe Partners, LLC in turn breached its payment obligation to Plaintiffs under the redemption agreement. On May 29, 2008, Kewadin Greektown Casino LLC and Monroe Partners, LLC filed for Chapter 11 bankruptcy protection in the Eastern District of Michigan.

In 2012, Plaintiffs undertook efforts to recover nearly $74 million in principal and interest still owed to them under the redemption agreement. Plaintiffs' counsel notified the Tribe and the Authority by letter that Plaintiffs, standing in the shoes of Monroe Partners, LLC as third-party beneficiaries to the guaranty agreement, were modifying and accelerating the Funding Obligations under paragraph 2. Plaintiffs' counsel modified paragraph 2 of the guaranty agreement to state:

> 2. **Funding Obligation**. The Sault Tribe and Authority, for value received, jointly and severally, unconditionally and absolutely, guaranty to fund

the Subscription Amount upon the event of default by the Subscriber in making payment of the Subscription Amount upon receipt by the Guarantors of notice and demand from Monroe and/or any other Retiring Members. As of October 17, 2012, the Guaranty is no longer subject to the Section 3 hereunder, entitled "Limitation." The Tribe and/or Authority shall immediately pay to Ted Gatzaros and Maria Gatzaros, as Retiring Members, upon delivery of written demand, all sums sue them . . . arising from the Subscriber's default of the Subscription Agreement. The Sault Tribe and Authority are also liable to reimburse any sums paid by the Ted Gatzaros and/or Maria Gatzaros, as Retiring Members, to Buchwald Capital Advisors, LLC, as litigation Trustee, or any other person or entity arising from the United States Eastern District Court and United States Bankruptcy Court Cases identified by case numbers 08-53104 and 2:12-CV-12340-PDB-RSQ. The Sault Tribe and Authority are also liable to Ted Gatzaros and/or Maria Gatzaros, as Retiring Members, for all cost of collection of the amounts due hereunder, including their actual attorney fees.

By unilateral action, Plaintiffs eliminated the limitations in paragraph 3 that had set the necessary conditions precedent on the obligation of the Tribe and the Authority to pay under the guaranty agreement if Kewadin defaulted on the subscription agreement. Plaintiffs declared the remaining amount of the debt, plus attorney fees, immediately due and owing to them from the Tribe and the Authority.

Plaintiffs justify their unilateral action by pointing to paragraph 8 of the guaranty agreement, which included various waivers by the Tribe and the Authority. Within paragraph 8, the Tribe and the Authority agreed

that Monroe may, once or any number of times, modify the terms of any Funding Obligations, compromise, extend, increase, accelerate, renew or forebear to enforce payment of any or all Funding Obligations, all without notice to the Sault Tribe and the Authority and without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement.

As third-party beneficiaries of the guaranty agreement, Plaintiffs contend they may step into the shoes of Monroe Partners, LLC and modify, accelerate, and enforce the terms of the Funding Obligations without notice and without affecting the obligation of the Tribe and the Authority to pay under the guaranty agreement. They further contend that the Tribe and the Authority waived

all defenses to this suit because the guaranty agreement says that the Tribe and the Authority "unconditionally and irrevocably waive each and every defense and setoff of any nature which, under principles of guaranty or suretyship, would operate to impair or diminish in any way the obligation of the Sault Tribe and the Authority under this Guaranty Agreement[.]"

## II.  ANALYSIS

Plaintiffs could not unilaterally modify the guaranty agreement for two primary reasons. First, the Tribe and the Authority did not agree in writing to the modification, as paragraph 10 of the guaranty agreement requires.   Second, Plaintiffs misconstrue the meaning of the waiver language found in paragraph 8 of the guaranty agreement.  We also find no merit in Plaintiffs' contention that the Tribe and the Authority waived all defenses they may have to the Plaintiffs' claim.

### A.  Plaintiffs could not unilaterally modify the guaranty agreement

*1.  The modification was not approved by the Tribe and the Authority*

Paragraph 10 of the guaranty agreement provides:

> No waiver, consent, modification or change of the terms of the Guaranty Agreement shall bind any of the Sault Tribe or Authority or Monroe unless in writing and signed by the waiving party . . . and then this waiver, consent, modification or change shall be effective only in the specific instance and for the specific purpose given. . . .

In construing the terms of a guaranty agreement, the parties' intentions govern.  If the contract language is unambiguous, construction of the agreement is a question of law for the court after it considers the entire instrument.  *See Mazur v. Young*, 507 F.3d 1013, 1018 (6th Cir. 2007) (citing Michigan contract law).  The guaranty agreement must be strictly construed in favor of the guarantor.  *Bandit Indus., Inc. v. Hobbs Int'l, Inc.*, 620 N.W.2d 531, 534–35 (Mich. 2001).

Paragraph 10 is not ambiguous. The Tribe and the Authority must consent in writing to any modification of the guaranty agreement. The Tribe and the Authority did not consent in writing to eliminate paragraph 3 from the guaranty agreement, which included the critical conditions precedent to their obligation to pay in the event of Kewadin's default. They also did not agree to modify paragraph 2 or to pay Plaintiffs' attorney fees. Plaintiffs' unilateral attempt to modify the contract language was ineffective under paragraph 10 of the guaranty agreement.

Michigan law permits contracting parties to amend a contract notwithstanding a written modification clause if both parties agree to do so, but mutuality is paramount and unilateral contract modifications are forbidden. Contracting parties "are free to *mutually* waive or modify their contract notwithstanding a written modification or anti-waiver clause," but this "freedom to contract does not permit a party *unilaterally* to alter the original contract." *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253 (Mich. 2003). "[M]utuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract." *Id.* Notwithstanding the written modification clause, the Tribe and the Authority did not verbally agree to modify the guaranty agreement in Plaintiffs' favor.

### 2. *Plaintiffs misconstrue the meaning of paragraph 8 of the guaranty agreement*

The second reason why Plaintiffs' attempt to modify the guaranty agreement fails is that Plaintiffs misconstrue the meaning of the waiver language found in paragraph 8 of the guaranty agreement. Paragraph 8 is largely lifted from a standard Michigan UCC form. R. 16-1 Page ID 396. The language of paragraph 8 allowed Monroe Partners LLC to modify the terms of the underlying debt obligation to Plaintiffs by compromising, extending, accelerating, renewing, or forebearing the underlying obligation, without releasing the Tribe and the Authority from their obligations under the guaranty agreement. This language was necessary to satisfy Michigan law,

which provides that any material alteration of a principal debt or obligation completely discharges any guaranty of that debt or obligation, unless the guarantor consents to the alteration. *Wilson Leasing Co. v. Seaway Pharmacal Corp.*, 220 N.W.2d 83, 88–89 (Mich. Ct. App. 1974). *See also Mazur*, 507 F.2d at 1018 (noting general rule that a guarantor is released from liability if an act or omission by the creditor discharges the principal debtor of the principal obligation by rule of law, even if the principal obligation has not been paid).

By including paragraph 8 in the guaranty agreement, the Tribe and the Authority waived notice and consent if Monroe Partners, LLC determined that it was necessary to modify in some way the underlying debt obligation to Plaintiffs. The Tribe and the Authority did not grant Monroe Partners, LLC (or Plaintiffs standing in Monroe's shoes as third-party beneficiaries) the right to modify the *guaranty agreement* unilaterally without the consent of the Tribe and the Authority.

Plaintiffs' interpretation of paragraph 8 would lead to an absurd result. If Plaintiffs could unilaterally modify the guaranty agreement any time they desired for any reason, then paragraph 10, requiring the consent of the parties in writing for any contract modification, would be read out of the contract. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 545 (6th Cir. 2007) (applying Michigan law and observing that contracts must be construed with common sense and in a manner to avoid an absurd result).

## B. The Tribe and the Authority did not waive their defenses

Finally, the Tribe and the Authority did not waive all legal and contract defenses they may have to Plaintiffs' claim. In paragraph 8 of the guaranty agreement, the Tribe and the Authority waived "each and every defense and setoff of any nature which, *under principles of guaranty and suretyship,* would operate to impair or diminish in any way the obligation of the

. . . Tribe and the Authority under this Guaranty Agreement[.]" R. 18-2 page ID 432 (emphasis added). The Tribe and the Authority agreed not to raise common guaranty or suretyship defenses that would allow them to avoid liability on the guaranty agreement. They did not waive all right to defend themselves against any and all claims.

This provision of the guaranty agreement aligns with settled law. "The guarantor may generally raise as a defense to liability on the guaranty any defense that could be raised by the principal debtor" with certain limited exceptions. Norton Creditors' Rights Handbook § 2:7 (July 2012). The primary suretyship defenses are impairment of recourse and impairment of collateral. *Id.* Guarantors routinely waive these suretyship defenses which would otherwise result in a discharge of the guarantor if the underlying debt is modified. Restatement (Third) of Suretyship and Guaranty, § 48, Comments a. & d. (June 2013); Norton § 2:7 ("The guarantor has numerous potential defenses to enforcement of the guaranty that are commonly referred to as suretyship defenses . . . [these] defenses are generally waiveable. Virtually all guaranties contain waivers of all suretyship defenses"). Nothing in the guaranty agreement before us waived the right of the Tribe and the Authority to raise ordinary defenses to Plaintiffs' attempted unilateral contract modification, nor did anything in the guaranty agreement waive the right of the Tribe and the Authority to file a Rule 12(b)(6) motion below.

### III. CONCLUSION

Because the guaranty agreement is unambiguous and the applicable law is clear, we have no basis on which to remand this matter to the district court for the taking of extrinsic evidence. One party to a contract may not unilaterally rewrite the agreement to obtain more favorable terms. Contract modification requires mutuality of consent, and that element is missing here. Accordingly, we AFFIRM the judgment of the district court.

**CLAY, Circuit Judge, dissenting.** Plaintiffs and Defendants dispute the meaning of the guaranty agreement ("Guaranty"), each asserting a different interpretation of the contract's language. Both parties ask this Court to interpret the Guaranty, find that the language is clear and unambiguous, and conclude that their proposed interpretation governs. The majority concludes that the Guaranty's language is unambiguous and that Defendants' asserted interpretation is the only plausible reading of this language. At this stage of the proceedings, where this Court must "construe the complaint in the light most favorable to . . . [P]laintiff[s and] accept all of the complaint's factual allegations as true," I cannot agree with the majority that "[P]laintiff[s] undoubtedly can prove no set of facts in support of the claims that would entitle relief." *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). Indeed, the majority is only able to uphold the district court's ruling by uncritically construing all disputed issues in Defendants' favor. Because I disagree with the majority's characterization of the Guaranty's language, I respectfully dissent.

## I.      The Ambiguity of the Guaranty's Language

The parties agree that under the Guaranty as originally drafted, Defendants are not obligated to pay the remaining debts. The conditions triggering the payment obligation under the limitations provision in paragraph 3 never occurred. Therefore, as the majority properly sets forth, the issue for this Court is not whether conditions occurred, but whether Plaintiffs had a right under the Guaranty to unilaterally modify the terms of the "Funding Obligations" to eliminate reference in paragraph 2 to the limitations contained in paragraph 3. Plaintiffs claim that their October 2012 letter only modified the terms of Defendants' "Funding Obligations" in the Guaranty, which is allowed by paragraph 8, not the terms of the Guaranty itself. On the other

hand, Defendants assert, and the district court and majority agree, that Plaintiffs unilaterally modified the terms of the Guaranty, which is clearly prohibited by paragraph 10.

As the majority properly sets forth, guaranties are construed as ordinary contracts. *31800 Wick Road Holdings, LLC v. Future Lodging-Airport, Inc.*, 848 F. Supp. 2d 757, 763 (E.D. Mich. 2012). Therefore, this Court applies rules of contract construction from Michigan law to interpret the Guaranty. "A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1086, 1092 (6th Cir. 2001). A court accomplishes this task by first looking to the language of the contract, which is "given its ordinary and plain meaning, rather than a technical or strained construction." *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 943–44 (6th Cir. 1993). *See also Pierson Sand & Gravel, Inc. v. Pierson Twp.*, 851 F.Supp. 850, 858 (W.D. Mich. 1994) (internal citation omitted) ("As a general rule under Michigan law, contract language is interpreted according to its ordinary meaning. That is, the parties' intent is deemed to have been consistent with the ordinary meaning of the plain and unambiguous terms they chose to express their agreement.").

This Court gathers the intent of the parties "from the entire instrument and not from detached portions. A contract cannot be disjointed or particular parts separated from the balance, as it is necessary to consider all . . . provisions of a contract . . . to determine the meaning of any particular part as well as the meaning of the whole document." *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195–96 (6th Cir. 1960). *See also Datron, Inc. v. CRA Holdings, Inc.*, 42 F. Supp. 2d 736, 742 (W.D. Mich. 1999) (internal quotation marks omitted) ("To determine the parties' intent, the contract must be read as a whole, and all its clauses must

be considered together to determine if and to what extent one may modify, explain or limit another.").

When a contract is unambiguous, a court must enforce its terms as written. In such an instance, where the terms of a contract are clear, unambiguous, and have a definite meaning, a court may not look to extrinsic evidence to determine the intent of the parties. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998); *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941). However, a court finds ambiguity in a contract if "its words may *reasonably* be understood in different ways." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 544 (6th Cir. 2007) (internal quotation marks omitted). "Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists." *Wonderland Shopping Ctr.*, 274 F.3d at 1095.

The district court and majority improperly conclude that the intent of the parties is clear and the language of the Guaranty is unambiguous. Although the language of paragraph 10 of the Guaranty clearly precludes the unilateral waiver, consent, modification, or change of the Guaranty's terms, that language may not be read in isolation. "Courts 'cannot simply ignore portions of a contract in order to avoid a finding of ambiguity . . . .'" *Tenke Corp.*, 511 F.3d at 544 (quoting *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003)). Paragraph 8 of the same Guaranty provides that Monroe[1] may "modify the terms of any Funding Obligations . . . without notice to the Sault Tribe and the Authority and without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty

---

[1]Plaintiffs claim that as third party beneficiaries of the Guaranty, they may step into the shoes of Monroe.

Agreement." (R. 18-2, Guaranty, at 432.)**[2]** The language of these two paragraphs is inherently contradictory. One paragraph clearly prohibits unilateral modification of the terms of the Guaranty, while the other paragraph expressly allows modification of the terms of any "Funding Obligations" without notice to the other party. This contract language is reasonably susceptible of two different meanings, and the extent of the right contained in paragraph 8 is unclear and ambiguous.

The district court's strained interpretation attempted to read clarity into this inherently unclear document by finding that the term "Funding Obligations" means "Subscription Amount" or "underlying indebtedness." Such an interpretation would preclude Plaintiffs under paragraphs 8 and 10 from modifying the terms of paragraph 2. The court based this conclusion on two factors. First, the district court and the majority opinion compared the Guaranty's language to the nearly identical language of a standard Michigan UCC Form that relates to the waiver of rights with respect to payment of an underlying indebtedness. The language of the UCC Form states as follows:

> Debtor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Indebtedness, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Indebtedness, and agree(s) that the Bank may, once or any number of times, modify the terms of any Indebtedness, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Indebtedness, or permit Borrower to incur additional Indebtedness, all without notice to Debtor and without affecting in any manner the unconditional obligation of Debtor under this Agreement.

---

**[2]**Citations to the record are accompanied by reference to Page ID numbers.

4 Mich. UCC Forms Annotated Form 9:1010 (3d ed.). The district court and the majority conclude that the parties in the instant case merely substituted "Funding Obligations" for the term "Indebtedness" in order to "satisfy Michigan law," Maj. Op. at 6, without changing the Form's underlying meaning.

Although this language is standard in Michigan contracts, it is not clear from the whole of the Guaranty that the modification of that provision was simply *pro forma* in nature. Paragraph 2 appears to define Funding Obligation as something much broader than the Subscription Amount. Had the parties substituted "Subscription Amount" for the term "Indebtedness," perhaps this Court could more easily resolve this dispute. However, the parties' intent as to choice of language cannot be divined simply by reference to the Michigan UCC Form.

Second, the district court relied on language in paragraph 6, which twice refers to the payment of "Funding Obligations." Based on that language, the district court found that "Funding Obligations" means the "Subscription Amount" or the underlying indebtedness. In coming to this conclusion, the district court again ignored the ambiguity in the language of the Guaranty and the contradictions between its provisions, favoring Defendants' reading of the contract over Plaintiffs' proposed reading.

The district court's interpretation ignores the precise language of paragraph 2, while Plaintiffs' proposed reading is consistent with its plain meaning. Once again, paragraph 2 states as follows:

> Subject to the limitations, terms and conditions set forth in this Guaranty Agreement, the Sault Tribe and the Authority, for value received, jointly and severally, unconditionally and absolutely guaranty to fund the Subscription Amount, as and when due from the Subscriber under the Subscription Agreement, upon an event of

> default by the Subscriber in making payment of the Subscription
> Amount, as and when due, and receipt by the Guarantors of notice
> and demand from Monroe (the "<u>Funding Obligations</u>").

(R.18-2, Guaranty, at 430.)  This language makes clear that "Funding Obligations" and "Subscription Amount" are not to be used interchangeably, and "Funding Obligations" are much broader than a mere amount of money owed under the contract.  There are two plausible meanings of "Funding Obligations," one that encapsulates a broad duty to pay, and one that simply means the underlying indebtedness owed to Plaintiffs.  Under the first of these possible meanings, Plaintiffs' proposed modification of the "Funding Obligations" contained in paragraph 2 is an entirely plausible interpretation, which is not clearly precluded by paragraphs 8 and 10.

The district court found that even if there was ambiguity in the language of "Funding Obligations," that ambiguity could be resolved by reference to basic rules of contract construction, which require that every word in a contract be given meaning, "all its parts are to be harmonized so far as reasonably possible," "and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer*, 77 N.W.2d 384, 386 (Mich. 1956) (internal quotation marks omitted).  The district court found that Plaintiffs' interpretation of paragraph 8 would render the limitations provision in paragraph 3 a nullity, leading to an absurd result.  The majority agrees, especially as to paragraph 10, stating that "Plaintiffs' interpretation of paragraph 8 would lead to an absurd result" because "paragraph 10, requiring the consent of the parties in writing for any contract modification, would be read out of the contract." Maj. Op. at 7.

While it is true that parts of a contract must be read to harmonize the whole and the contract should be construed to give each subpart meaning, it is not clear from the language of the Guaranty that the parties themselves intended to embrace the district court and majority's interpretation. The district court found that

> [t]he parties negotiated an important limitation on the Tribe's guaranty obligation tied to the amount of distributions the Tribe received from the Greektown Casino. It was never contemplated that the Tribe would be liable to the Gatzaros [sic] if the Distributions never reached the agreed upon levels spelled out in Paragraph 3. . . . It would be an absurd result to permit the Gatzaros [sic] to simply eliminate by fiat this important, bargained for limitation.

(R. 20, Op. and Order, at 778–79.) Although that may be one way of viewing the intent of the parties, an equally plausible view is that paragraph 8 was an important, bargained-for right to unilaterally modify the Funding Obligations. The contracts in this case involved large deals and large amounts of money, and the Guaranty was meant to protect Plaintiffs' assets. At this stage in the proceedings, where a court is to "construe the complaint in the light most favorable to the plaintiff [and] accept all of the complaint's factual allegations as true," *Grindstaff*, 133 F.3d at 421, the majority and the district court have gone too far in attempting to divine the intent of the parties without a sufficient evidentiary basis.

Plaintiffs have articulated a plausible interpretation of this contract, and although the district court and majority contend that such an interpretation leads to an absurd result, it is not clear that the contract was not meant to yield such a result. The district court and the majority may not resolve the lack of clarity in the language of paragraph 2 and the contradiction between paragraphs 8 and 10 by reading new meaning into a contract that plausibly reflects the parties'

intent. Rather, the proper way to resolve the ambiguity in this contract is to remand the case and give the parties an opportunity to establish their intent through extrinsic evidence.

## II.     The Extent of Waiver of Defenses

Plaintiffs' second argument alleges that regardless of the reading we choose to adopt, Defendants should be precluded from asserting any defenses under contract law because they waived all of those defenses by signing the Guaranty. Plaintiffs claim that the second paragraph of the "Waivers" provision contained in the Guaranty extends to all defenses, including those under basic Michigan contract law. On the other hand, Defendants assert that the "Waivers" provision includes only suretyship and guaranty defenses and does not reach all contract defenses.

The full "Waivers" provision states as follows:

> The Sault Tribe and the Authority waive any right to require Monroe to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from the Subscriber or any other person, or otherwise comply with the provisions of Section 9–504 of the Michigan or other applicable Uniform Commercial Code; or (c) pursue any other remedy in Monroe's power. The Sault Tribe and the Authority waive notice of acceptance of this Guaranty Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Funding Obligations, any and all other notices to which the Sault Tribe and the Authority might otherwise be entitled, and diligence in collecting any Funding Obligations, and agree that Monroe may, once or any number of times, modify the terms of any Funding Obligations, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Funding Obligations, all without notice to the Sault Tribe and the Authority and without affecting in

> any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement.
>
> The Sault Tribe and the Authority unconditionally and irrevocably waive each and every defense and setoff of any nature which, under principles of guaranty or suretyship, would operate to impair or diminish in any way the obligation of the Sault Tribe and the Authority under this Guaranty Agreement, and acknowledge that each such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Sault Tribe and the Authority now or later securing this Guaranty Agreement and/or the Funding Obligations, and acknowledge that as of the date of this Guaranty Agreement no such defense or setoff exists.

(R. 18-2, Guaranty, at 432–33.)

The district court concluded that Defendants only waived those defenses set forth in the Restatement Third of Suretyship and Guaranty. After reviewing each of the cases submitted by Plaintiffs as support for their argument, the court found that none were analogous to the instant case and concluded that because Plaintiffs were unable "to unearth a case that interprets waiver of defense language similar to that at issue here, . . . [they] failed to support their legal contention that this waiver should extend to *any* defense that the Tribe may assert in this case." (R. 20, Op. and Order, at 783.) The district court, joined by the majority, also acknowledged that waiver of typical suretyship and guaranty defenses is common, and assumed that this result was also desired by the parties in the instant case.

There is no dispute that the Guaranty's "Waivers" provision is a valid waiver clause under which Defendants agreed to waive certain of their defenses. Instead, the dispute arises once the parties attempt to decipher the meaning of the provision's terms. As explained above, the Guaranty is construed as a contract, and Michigan contract interpretation principles apply.

Therefore, at the motion to dismiss stage, this Court must determine whether the ordinary and plain meaning of the Guaranty is clear and unambiguous such that only one interpretation of this waiver language is plausible. This Court interprets the contract as a whole, "as it is necessary to consider all of the provisions of a contract in order to determine the meaning of any particular part as well as the meaning of the whole document." *Florida Canada Corp.*, 280 F.2d at 195–96.

Of course, one possible reading of this language is the one provided by the majority and the district court. However, this is not the only plausible interpretation of the "Waivers" provision. Instead, when this Court examines the provision in its entirety, rather than disassociating the second paragraph from the first, it appears that the first paragraph of the provision provides a broad waiver of numerous rights and the second paragraph expands, rather than constricts, those rights. What this paragraph of the "Waivers" provision does or does not do is inescapably linked to the language contained in the first paragraph. It is problematic to elevate one of these readings over the other, especially since the meaning of "Funding Obligations" in relation to the parties' rights under the Guaranty is so unclear. Because there is more than a single plausible interpretation of the Guaranty's "Waivers" provision, extrinsic evidence would seem to be required in order to divine the intent of the parties as to their rights and responsibilities under the contract. Obviously, this conclusion is contrary to the approach followed by the majority opinion, which affirms the district court's ruling on Defendants' motion to dismiss without the benefit of extrinsic evidence.

Because the language of the Guaranty is ambiguous, I would reverse the decision of the district court granting Defendants' motion to dismiss and remand the case to allow for presentation of extrinsic evidence. The pursuit of clarity would greatly benefit by so doing.